TAYLOR v. ACADEMY IRON & METAL CO., APPELLANT; ALUMAX, INC., F.K.A. APEX INTERNATIONAL ALLOYS, INC., APPELLEE.

[Cite as Taylor v. Academy Iron & Metal Co. (1988), 36 Ohio St. 3d 149.]

(No. 87-127—Decided April 13, 1988.)

*Gallagher, Sharp, Fulton & Norman, Edward J. Cass, Gary L. Nicholson* and *James M. Speros,* for appellant.

*Ulmer, Berne, Laronge, Glickman & Curtis, Murray K. Lenson* and *Jeffrey Van Wagner,* for appellee.

WRIGHT, J. The primary issue presented in this appeal is whether a third-party tortfeasor, when sued by or on behalf of an injured or deceased employee, is entitled to indemnity from an employer who is a participating member of the Ohio workers' compensation system. In other words, does the workers' compensation law bar an indemnification claim by a third-party tortfeasor against an employer for damages that are suffered by an employee who is injured or killed in the course of his employment?

In our view, the Ohio Constitution and R.C. Chapter 4123 effectively preclude, on both procedural and substantive grounds, such a claim for indemnification. Procedurally, a third-party tortfeasor has no standing to seek indemnification from an employer who is in compliance with the workers' compensation law. Substantively, the law relieves a complying employer from common-law liability to anyone for damages suffered by an employee who is injured or killed in the course of his employment, unless, of course, the injury or death was caused by intentional tortious conduct of the employer and the employee himself brings a common-law action against the employer.

The above holdings rely upon a common premise: the workers' compensation system was designed to operate as an employer's exclusive form of liability for work-related injuries or

deaths to employees. The rationale behind the adoption of the Ohio workers' compensation law was set forth by this court in *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 614, 23 O.O. 3d 504, 508, 433 N.E. 2d 572, 577, certiorari denied (1982), 459 U.S. 857, where we stated:

"* * *The Act operates as a balance of mutual compromise between the interests of the employer and the employee whereby employees relinquish their common law remedy and accept lower benefit levels coupled with the greater assurance of recovery and employers give up their common law defenses and are protected from unlimited liability.* * *"

To accomplish this twofold goal of employer immunity and improved recovery by injured employees, an amendment to the Ohio Constitution was adopted in 1912 that paved the way for a compulsory workers' compensation law.[1] This amendment, as embodied in Section 35, Article II of the Constitution,[2] provides, in pertinent part:

"For the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen's employment, laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state, determining the terms and conditions upon which payment shall be made therefrom. Such compensation shall be in lieu of all other rights to compensation, or damages, for such death, injuries, or occupational disease, and *any employer who pays the premium or compensation provided by law, passed in accordance herewith, shall not be liable to respond in damages at common law or by statute for such death, injuries or occupational disease.* * *"* (Emphasis added.)

In addition, R.C. 4123.74[3] specifically provides that:

"Except as authorized in section 4121.80 of the Revised Code, employers who comply with section 4123.35 of Revised Code shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of his employment, or for any death resulting from such injury, occupational disease, or bodily condition occurring during the period covered by such premium so paid into the state insurance fund, or during the interval of time in which such employer is permitted to pay such compensation directly to his injured employees or the dependents of his killed employees, whether or not such

---

[1] Ohio's first workers' compensation law was voluntary. In upholding the constitutionality of the first law, this court emphasized the voluntary nature of the Act and strongly suggested that coercive legislation would contravene constitutional provisions. *State, ex rel. Yaple,* v. *Creamer* (1912), 85 Ohio St. 349, 97 N.E. 602.

As a result, an amendment to the Constitution was proposed that would allow for a compulsory system of workers' compensation. This amendment passed by a substantial margin on September 3, 1912, and on February 26, 1913, the General Assembly enacted a compulsory workers' compensation law.

[2] This constitutional provision was amended in 1923 to read as it does in its present form.

[3] This statute was amended, effective August 22, 1986, adding the introductory phrase concerning the exception of R.C. 4121.80.

injury, occupational disease, bodily condition, or death is compensable under sections 4123.01 to 4123.94 of the Revised Code."

As these provisions explicate, the General Assembly, in carrying out its constitutional mandate and adopting a workers' compensation law, provided complying employers with immunity from damages for employee injuries that arise in the course of employment. Such immunity, however, is not limited to employee claims but also applies to claims by third parties.

We agree with the Ohio appellate courts that have addressed this issue and held that these provisions demonstrate the legislature's intention to "provide against liability of the employer to *anyone* for damages arising from any injury, disease or bodily condition of an employee arising out of his employment," *Williams* v. *Ashland Chemical Co.* (1976), 52 Ohio App. 2d 81, 86-87, 6 O.O. 3d 56, 59, 368 N.E. 2d 304, 308, as will be discussed *infra.* See, also, *Maynard* v. *Henderson* (1982), 3 Ohio App. 3d 403, 405, 3 OBR 469, 471, 445 N.E. 2d 727, 729; *Davis* v. *Consolidated Rail Corp.* (1981), 2 Ohio App. 3d 475, 476-477, 2 OBR 601, 603, 442 N.E. 2d 1310, 1312.

I

"The doctrine of standing requires a litigant to be in the proper position to assert a claim. The issue of standing involves both constitutional and prudential considerations.* * *

"Apart from its constitutional elements, the doctrine of standing also requires that a plaintiff's injury be arguably within the zone of interests to be protected or regulated by the statute in question." *J. V. Peters & Co.* v. *Ruckelshaus* (N.D. Ohio 1984), 584 F. Supp. 1005, 1008, affirmed on other grounds *sub nom., J. V. Peters & Co.* v. *Admr., Environmental Protection Agency* (C.A. 6, 1985), 767 F. 2d 263.

Appellant asserts that it has standing to bring a third-party action against appellee for indemnification, citing as support our holding in *Blankenship.* In that case, we held that an intentional tort was not an "injury" arising out of the course of employment. Therefore, the workers' compensation law "does not bestow upon employers immunity from civil liability for their intentional torts and an employee may resort to a civil suit for damages." *Id.* at 613, 23 O.O. 3d at 508, 433 N.E. 2d at 576.

Appellant asserts that Bobby Taylor's death and Scargill's injuries were the result of appellee's "intentional" acts within the meaning of *Blankenship* and *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046. Thus, appellant contends that it, as a third-party tortfeasor, may pursue a civil suit, *i.e.*, indemnification, against the appellee to recover damages it paid for the work-related death of Taylor and injury to Scargill.

Such a contention, however, lacks merit. We will assume that the facts in this case would support a cause of action under the "intentional tort" doctrine enunciated in *Blankenship,* an assumption that appellee vigorously disputes. Accepting such a premise, we would note that *Blankenship* expressly states that " an *employee* may resort to a civil suit" to recover damages from an employer for intentional torts. As this language clearly indicates, only an employee or his legal representative, not a third-party tortfeasor, may bring a civil suit against an employer alleging that the employer committed intentional torts leading to an employee's work-related death, disease, or injury.

In addition, to allow this type of third-party practice to prevail under appellant's interpretation of *Blankenship* would work to emasculate the major premise upon which the workers'

compensation system is based, *i.e.*, employers relinquish their common-law defenses in return for protection from unlimited liability. As such, it is apparent that appellant's injury is not "arguably within the zone of interests to be protected or regulated" by the Ohio workers' compensation law. Therefore, a third-party tortfeasor has no standing to bring an indemnification claim against an employer, who is acting in compliance with the Ohio workers' compensation law, for damages suffered by an employee in the course of or arising out of his employment.

## II

Even if appellant did have standing, the legal grounds on which it bases its claim for indemnification are questionable at best. This court distinguished the concepts of indemnification and contribution in *Travelers Indemnity Co.* v. *Trowbridge* (1975), 41 Ohio St. 2d 11, 13-14, 70 O.O. 2d 6, 8, 321 N.E. 2d 787, 789, where we stated:

"Although the two forms of reimbursement are similar, there is a distinct difference. Contribution, when it exists, is the right of a person who has been compelled to pay what another should pay in part to require partial (usually proportionate) reimbursement and arises from principles of equity and natural justice.* * * Indemnity, on the other hand, arises from contract, express or implied, and is a right of a person who has been compelled to pay what another should pay in full to require complete reimbursement.* * *"

Appellant seeks to bring in appellee as a third-party defendant for indemnification purposes as stated above.

In *Bevis* v. *Armco Steel Corp.* (1951), 156 Ohio St. 295, 305-306, 46 O.O. 172, 176, 102 N.E. 2d 444, 448-449, we recognized that an employer can expressly "assume an obligation to indemnify, notwithstanding that the provisions of the statutes relative to workmen's compensation would otherwise provide him with immunity from such an obligation. That immunity is obviously not of such a character that it cannot be so waived."

While express indemnity contracts, where an employer voluntarily waives his workers' compensation immunity, are valid to impose liability on an employer who could otherwise avoid it, we cannot accept the argument that indemnity contracts can be *implied* between an employer and third-party tortfeasor to impose liability on the employer. Such an implication would contravene the intent and purpose of the workers' compensation law. In fact, we agree with the holdings of other Ohio courts interpreting this issue that a surrender of the employer immunity must be made by a specific, express waiver. See *Davis* v. *Consolidated Rail Corp.* (1981), 2 Ohio App. 3d 475, 2 OBR 601, 442 N.E. 2d 1310; *Schwierking* v. *Sun Petroleum Products Co.* (Jan. 20, 1984), Lucas App. No. L-83-250, unreported.

In the instant case, no express indemnity contract or specific waiver of immunity was executed. Instead, appellant asserts that the doctrine of equitable (as opposed to contractual) indemnification should apply to the facts here. Appellant suggests the indemnity claim can be allowed based on a theory of active (primary) versus passive (secondary) tortious conduct. Appellant claims that its negligence, which can be characterized as passive or secondary, combined with the alleged intentional wrongful conduct of appellee, which can be characterized as active or primary, entitles appellant to indemnification.

Application of such a theory makes several assumptions: first, that appellee knew of the peril associated with the scrap aluminum sold by appellant; second, that this knowledge as well as

other acts by appellee rose to a level of active or primary tortious conduct; and finally, and most importantly, that Ohio workers' compensation law permits indemnification based on a theory of active-passive or primary-secondary tortious conduct. Because this appeal arose before the facts of this case were fully developed, the first two assumptions are difficult, if not impossible, to prove. But the final assumption, which involves a legal rather than factual question, is not difficult to rebut.

As previously noted, a waiver of employer immunity granted under the workers' compensation law must be express. The type of indemnification sought in this case, by its very nature, is implied. To extend employer liability beyond the scope of the workers' compensation law under the guise of implied indemnification would pervert the law far beyond its purpose.

Decisions in a number of other states agree with this position. See, e.g., *Redwing Carriers, Inc.* v. *Crown Cent. Petroleum Corp.* (Ala. 1978), 356 So. 2d 1203; *McCleskey* v. *Noble Corp.* (1978), 2 Kan. App. 2d 240, 577 P. 2d 830; *Roberts* v. *American Chain & Cable Co.* (Me. 1969), 259 A. 2d 43; *Outboard Marine Corp.* v. *Schupbach* (1977), 93 Nev. 158, 561 P. 2d 450; *Public Service Elec. & Gas Co.* v. *Waldroup* (1955), 38 N.J. Super. 419, 119 A. 2d 172; *Rucker Co.* v. *M & P Drilling Co.* (Okla. 1982), 653 P. 2d 1239; *Rupe* v. *Durbin Durco, Inc.* (Tenn. App. 1976), 557 S.W. 2d 742; *Seattle First Natl. Bank* v. *Shoreline Concrete Co.* (1978), 91 Wash. 2d 230, 588 P. 2d 1308.

In addition, a 1945 Ohio appellate case with facts remarkably similar to those in the instant case adopted similar reasoning. In *Bankers Indemn. Ins. Co.* v. *Cleveland Hardware & Forging Co.* (1945), 77 Ohio App. 121, 43 Ohio Law Abs. 205, 32 O.O. 395, 62 N.E. 2d 180, plaintiff insured a supplier of bottled gas against injuries sustained by persons due to the supplier's negligence. After oxygen was supplied to a purchaser ordering nitrogen, a severe explosion occurred, killing three of the defendant's employees. The plaintiff settled with the employees' estates and brought an action against the defendant employer for indemnification, claiming that the explosion was the result of the defendant's negligence. The appellate court rejected the indemnification claim, stating:

"Under the Workmen's Compensation Act, a subscribing and complying employer is relieved of any liability at common law because of injuries, death or occupational disease that befall his employees while acting in the course and scope of their employment, and such relief from liability extends to a case where a third person, having paid damages for the death of employees of such employer in an action based on the third person's negligence, seeks to recover from the employer the amount of damages paid, on the ground that the liability of the employer is primary and that of the third person secondary." *Id.* at paragraph three of the syllabus.

We believe this reasoning can be extended to cases such as the one here in which the party seeking indemnity alleges that the employer committed an intentional tort rather than negligence. Therefore, we hold that relief from common-law liability under the Workers' Compensation Act extends to cases in which a third-party tortfeasor, having paid damages to an employee or his estate, seeks indemnity from the employer on the ground that the liability of the employer is primary or active and the liability of the third-party tortfeasor is secondary or passive.

## III

Finally, appellant asserts that the court of appeals abused its discretion when it decided an issue not raised in the trial court or briefed by the parties on appeal, *i.e.*, that R.C. 4121.80 barred appellant's right to indemnification against the appellee. Appellant also asserts that R.C. 4121.80 is unconstitutional as a retroactive law. Since we uphold the trial court's decision on other grounds, these propositions of law need not be addressed.

Accordingly, and for the foregoing reasons, we affirm the decision of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., LOCHER, HOLMES and H. BROWN, JJ., concur.

SWEENEY and DOUGLAS, JJ., separately dissent.

DOUGLAS, J., dissenting. I must respectfully dissent. It is my judgment that the majority opinion contains a number of basic flaws and, accordingly, I am compelled to write at some length. My purpose in writing is not solely to set forth the various misstatements and inconsistencies in the majority opinion. I write also because I believe that this case presents an excellent opportunity for addressing some nagging conceptual problems in this area, problems which the majority opinion compounds rather than resolves.

The first task at hand is an examination of the majority opinion itself. Its most serious transgressions are not obvious on its face because the majority has suppressed certain salient facts set forth by appellant in its argument. Without discussing or even mentioning these facts, an uninformed reader might believe that the majority opinion reaches a supportable conclusion. When *all* the facts of the case are considered, however, it becomes clear that the result is not only not supportable — it is just plain wrong and unfair. In addition, when the *actual* facts of the case are analyzed, it should be readily apparent that this case has nothing to do with the *Blankenship* doctrine.

The instant cause traces its origins to the filing of a complaint on August 1, 1983, by Henry Taylor, individually and as administrator of the estate of his son Bobby Lee Taylor, and by Luke Scargill. Appellant was named as the sole defendant in that action which sought damages on a products liability theory for the death of Bobby Lee Taylor and severe bodily injury to Luke Scargill. Appellant subsequently filed a third-party complaint[4] against appellee on June 3, 1985, alleging that appellee *"willfully and intentionally* engaged in acts and omissions which were the proximate causes of the injuries and the death complained of * * *" (emphasis added) in the Taylor-Scargill action. The facts set forth by appellant in its argument are as follows. Appellee, upon receipt of the scrap supplied to it by appellant, cleans, weighs, tests and partially processes the scrap before accepting it and paying for it. Once the particular batch in question was accepted by appellee, it was subjected to the crusher/dryer process, and a small explosion occurred in which no one was injured. The scrap was then removed for further testing. This testing, according to appellant,

---

[4] Appellant had filed a prior third-party complaint on January 18, 1984, which was voluntarily dismissed without prejudice on May 31, 1984.

was totally inadequate under the circumstances. Appellant argues that appellee then resumed processing of this batch despite subjective concerns that something in the scrap was still explosive. In the face of this concern, appellee instructed the decedent Bobby Lee Taylor to stand over the material while it was being fed into the crusher/dryer, and stationed Luke Scargill nearby to make sure Taylor did his job. After only a few moments, a second explosion occurred, killing Taylor and severely injuring Scargill.

Appellant requested that appellee be required to indemnify appellant for any damages and costs for which appellant was found to be liable in the underlying actions of Taylor and Scargill. No prayer, by appellant, for contribution was included. On July 3, 1985, appellee filed a motion to dismiss the third-party complaint for failure to state a claim upon which relief may be granted. Appellee alleged in support of that motion that appellee was entitled to the immunity granted to complying employers under Section 35, Article II of the Ohio Constitution and R.C. 4123.74. *Appellee filed no answer to the third-party complaint.* On August 13, 1985, appellant moved for leave to file an amended third-party complaint for the sole purpose of adding a claim for *contribution.* The amended complaint was filed along with the motion for leave. Approximately one month later, the trial court granted appellee's motion to dismiss the third-party complaint. On the same day, the court ruled that appellant's motion for leave to file an amended third-party complaint was now "moot." It is from this dismissal of its third-party complaint that appellant appeals.

A grave defect in the trial court's handling of this matter is immediately apparent. *The court had no authority to refuse to consider appellant's amended third-party complaint.* Civ. R. 15(A) states in pertinent part:

"A party may amend his pleading *once as a matter of course at any time before a responsive pleading is served* * * *. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party. * * *" (Emphasis added.)

Since no responsive pleading had been served at the time appellant filed its amendment to its complaint, appellant had an absolute right to amend. Appellee never served an answer, and the motion to dismiss is *not* a "responsive pleading" within the meaning of Civ. R. 15(A).[5] Thus, the trial court had no discretion in the matter; it was duty-bound to consider appellant's *amended* third-party complaint. It exceeded its authority when it dismissed the complaint without ruling on the amended version. Thus, the question arises as to whether the third-party complaint, *as amended,* should have been dismissed. The answer is clearly "no."

---

[5] Civ. R. 7(A), relating to pleadings, provides:

"Pleadings. There shall be a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned under the provisions of Rule 14; and a third-party answer, if a third-party complaint is served. *No other pleadings shall be allowed,* except that the court may order a reply to an answer or a third-party answer." (Emphasis added.)

A "motion" is not included in this exclusive list of items which constitute pleadings. In fact, a separate provision in the rules relates to motions. See Civ. R. 7(B).

It is critical to remember, of course, that the requirements for a successful Civ. R. 12(B)(6) motion are extremely difficult to meet. "In order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted (Civ. R. 12(B)(6)), it must appear *beyond doubt from the complaint* that the plaintiff can prove *no* set of facts entitling him to recovery." (Emphasis added.) *O'Brien* v. *University Community Tenants Union* (1975), 42 Ohio St. 2d 242, 71 O.O. 2d 223, 327 N.E. 2d 753, syllabus. Thus, to sustain such a motion, the trial court must resolve any and all doubts in favor of the party against whom the motion is made. Further, *the material allegations of the complaint are taken as admitted. Royce* v. *Smith* (1981), 68 Ohio St. 2d 106, 22 O.O. 3d 332, 429 N.E. 2d 134. Thus, if the allegations of the complaint arguably set forth *any* cognizable cause of action, the motion must be denied. *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 23 O.O. 3d 504, 433 N.E. 2d 572.

Assuming, as we must, the truth of appellant's allegations that appellee acted intentionally to injure its two employees, then appellee is not entitled to the employer immunity provided by R.C. 4123.74, as will be explained more fully *infra*. In that event, appellee may be liable to appellant in contribution. The prayer for contribution contained in the amended third-party complaint should have been considered by the trial court, since, as noted earlier, appellant was entitled at that point to amend the complaint once as a matter of course. With that amendment, the third-party complaint states a cause of action for contribution and the Civ. R. 12(B)(6) motion should have been denied.

R.C. 2307.31(A) provides in relevant part:

"Except as otherwise provided in this section or section 2307.32 of the Revised Code, where two or more persons are jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them. The right of contribution exists only in favor of a tortfeasor who has paid more than his proportionate share of the common liability, and his total recovery is limited to the amount paid by him in excess of his proportionate share. * * *"

Judgment was never entered against appellant in the Taylor-Scargill lawsuit. Appellant entered into a settlement with both of the plaintiffs therein. R.C. 2307.31(B) provides that a tortfeasor who enters into a settlement with a claimant is entitled to contribution only if the liability of the tortfeasor from whom contribution is sought was also extinguished by the settlement. Thus, appellant is entitled to contribution if it can show that appellee's liability, if any, was extinguished by virtue of appellant's settlement with the claimants. It follows that a Civ. R. 12(B)(6) dismissal was inappropriate in this case, since it does not appear beyond doubt from the face of the complaint that appellant can prove no set of facts entitling it to recover. *O'Brien, supra.*

The majority today grudgingly acknowledges that the allegations of intentional misconduct in appellant's third-party complaint must be accepted as true, but then proceeds to dispose of the complaint on the assumption that the allegations are not true. I would think it would be clear to anyone at this late date that intentional misconduct by an employer which results in an injury to his employee is outside the scope of the

Workers' Compensation Act and that the employer in such cases is not entitled to the protections afforded by the Act. *Blankenship, supra; Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046. The majority's discussion of the immunity conferred on complying employers by Section 35, Article II of the Ohio Constitution and by R.C. 4123.74 is completely inappropriate. The sole purpose of that discussion by the majority is to provide a means for reaching a particular desired result. The majority strives to justify its determination to shield the employer herein with argument which serves only to further expose the unsound reasoning of the entire opinion. Employer immunity is available in this case, the majority states, because *Blankenship* holds that *only an employee* may bring an intentional tort action against the employer! And how does the majority glean such a holding from *Blankenship?* It quotes' from that decision a statement that includes the verbiage, "an employee may resort to a civil suit * * *." From this phrase, the majority extracts an "express" and "clearly indicate[d]" holding that *only* an employee or his legal representative may bring such a suit!

Perhaps recognizing the fatuity of this position, the majority attempts to bolster this conclusion by the only means left to its disposal: confusing the issues. It states that "to allow this type of third-party practice to prevail under appellant's interpretation of *Blankenship* would work to emasculate the major premise upon which the workers' compensation system is based, *i.e.,* employers relinquish their common-law defenses in return for protection from unlimited liability." The fundamental fallacy of this statement is manifest. If the conduct of the employer herein was indeed intentional, an assumption that the majority

acknowledges must be made, then the protections of the workers' compensation system have no relevance whatsoever.

Thus, we see that where the required assumption that the employer's conduct was intentional proves bothersome, the majority simply opts out of that assumption and analyzes this case as if it involved negligence only. Again, the reader cannot escape the impression that the majority's decision in this case was not the result of objective deliberation. While purporting to reaffirm *Blankenship,* the majority opinion is written as if *Blankenship* never existed. I fear that the result will be further obfuscation of this already confused area.

The majority's discussion of the indemnification issue is equally lamentable. The analysis is again distorted beyond recognition by the majority's misguided insistence on appellee's entitlement to employer immunity. The resulting conclusion that appellant is not eligible for indemnification because appellee did not expressly waive this immunity is, of course, a *non sequitur.* The majority then boldly bases its rejection of appellant's indemnification claim on the fact that the claim calls for unwarranted assumptions! And what are these unwarranted assumptions? The majority first balks at assuming that appellee knew of the danger posed by the product. This assumption is "unwarranted," according to the majority, because such knowledge is "difficult, if not impossible, to prove." The majority must be aware that the difficulty of proving any element of a cause of action is an absolutely irrelevant consideration in reviewing the propriety of a Civ. R. 12(B)(6) dismissal. *The facts as alleged are to be taken as true.* The majority next declines to assume that workers' compensation law permits indemnification

where the employer's misconduct was active and the third party's conduct was passive. In response, I would merely emphasize once again that workers' compensation law *does not apply* where the employer's conduct was intentional.

The majority then compounds its errors by injecting further irrelevancies concerning whether the Workers' Compensation Act contemplates that a complying employer may be liable to third persons for employee injuries covered by the Act. It concludes that such liability would pervert the purposes of the Act, and then boldly states that its reasoning for this conclusion can be extended to cases involving intentional misconduct. This incredible quantum leap is supported by *no* analysis and *no* authority. This is because it is, in fact, unsupportable. The statement, perhaps more than any other in the opinion, exposes the majority's distorted perspective. It is typical of the repeated blurring of the distinctions between an employer's negligent conduct, which is covered by the Act, and intentional misconduct, which is by its nature outside the scope of the Act. A clarification of these distinctions is therefore appropriate at this juncture.

The Workers' Compensation Act, R.C. Chapter 4123, was designed to create a kind of no-fault insurance system under which employees forfeited their common-law remedies in exchange for employers' relinquishment of their common-law defenses. *Blankenship, supra,* at 614, 23 O.O. 3d at 508, 433 N.E. 2d at 577. The purpose of the Act is "to compensate workers who are injured as a result of the requirements of their employment." *Village* v. *General Motors Corp.* (1984), 15 Ohio St. 3d 129, 133, 15 OBR 279, 282, 472 N.E. 2d 1079, 1082. "Injury" is defined in R.C. 4123.01 as "any injury, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment." R.C. 4123.01(C). Thus, to be included within the coverage of the Act, the injury must be received *both* "in the course of" *and* "arising out of" the employment. To be compensable, the injury need not have resulted from negligence on the part of the employer. *Indus. Comm.* v. *Weigandt* (1921), 102 Ohio St. 1, 130 N.E. 38, paragraph two of the syllabus. The typical on-the-job injury results either from pure accident or from some party's negligence, and will fall within the confines of the Act. For example, suppose a window washer is injured in a fall from a scaffold. In the vast majority of cases, this injury would have been received during the course of the worker's employment, as he was engaged in his work duties at the time, and arising out of his employment, in that the cause of the injury was directly connected to the employment. As will be seen *infra,* an injury *intentionally* inflicted on an employee may be received in the course of employment, but such an injury *never* arises out of the employment. Thus, the protections afforded by the Act do not apply.

This court defined the term "course of employment" in *Indus. Comm.* v. *Davison* (1928), 118 Ohio St. 180, 160 N.E. 693, wherein it is stated that "[a]n employee is in the course of his employment while he is performing the obligation of his contract of employment." *Id.* at paragraph two of the syllabus. This definition was further refined in the case of *Indus. Comm.* v. *Ahern* (1928), 119 Ohio St. 41, 162 N.E. 272. "Under Section 35, Article II of our Constitution, and the law enacted pursuant thereto, the phrase 'in the course of employment,'

connotes an injury sustained in the performance of some required duty done directly or incidentally in the service of the employer." *Id.* at paragraph two of the syllabus. Thus, the window washer mentioned above would be considered to have been injured in the course of his employment, since at the time of the injury he was engaged in the performance of his work duties.

To be included within the scope of the Act, the injury must also be one "arising out of" the employment. "For an injury to 'arise out of the employment' obviously requires a certain causal connection between the work or employment and the injury. It arises out of the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work was required to be performed and the resulting injury." *Fox* v. *Indus. Comm.* (1955), 162 Ohio St. 569, 573, 55 O.O. 472, 474, 125 N.E. 2d 1, 4. The injury to our window washer would have arisen out of his employment under this test, since a definite causal connection exists between the conditions under which his work must be performed and the resulting injury.

By contrast, an injury intentionally inflicted by an employer can never arise out of the employment. Again, a hypothetical example will facilitate the analysis, and an extreme example will serve best. Suppose a factory worker is engaged in her duties on the assembly line. Her employer walks by and stops to watch the progress of the work. The worker becomes nervous and drops an expensive tool, breaking it. In a fit of rage, the employer grabs the worker and shoves her against the moving assembly line, causing her serious injury.

The distinctions between this kind of injury and the injury which befell our window washer are obvious. The latter is the sort of occurrence which may reasonably be expected to be a risk of the employment. All forms of employment involve a certain amount of risk, whether it be injury from machinery or from a fall down a flight of stairs. Generally, injuries resulting from work-related risks will be included within the scope of the Workers' Compensation Act. Injuries intentionally inflicted by an employer stand in stark contrast to these more typical work injuries. Such intentionally inflicted injuries are *never* a risk of employment. *Blankenship, supra,* at 613, 23 O.O. 3d at 508, 433 N.E. 2d at 576. They are certainly not contemplated by the parties to the employment relationship as being connected to the employment, either directly or incidentally. See *Egan* v. *National Distillers & Chemical Corp.* (1986), 25 Ohio St. 3d 176, 189, 25 OBR 243, 254, 495 N.E. 2d 904, 914 (Douglas, J., concurring in judgment only). The factory worker described above did not implicitly agree to be assaulted by her employer simply by virtue of her acceptance of employment. Such injuries do not arise out of the employment, and are, therefore, outside the coverage of the Act. There is no "causal connection between the conditions under which the work was required to be performed and the resulting injury" as delineated in *Fox, supra.* The conditions under which the work is required to be performed do not under any circumstances include exposure to injury *intentionally* inflicted by the employer. Since such injury falls so clearly *outside* the definition of "injury" in R.C. 4123.01(C), it was not intended to be covered by the Act.

This distinction was recognized in the early cases decided after the adoption of the Act. In *Fassig* v. *State, ex rel. Turner* (1917), 95 Ohio St. 232, 116

N.E. 104, this court held that "[t]he provisions in Section 35, Article II of the Constitution, and in the statute with reference to an injury received in the course of employment refer only to an injury which is the result of or arises out of the employment. *Such provisions do not cover any injury which has its cause outside of and disconnected with the employment, although the employe may at the time have been engaged in the work of his employer in the usual way.*" (Emphasis added.) *Id.* at paragraph five of the syllabus. In *State, ex rel. Yaple,* v. *Creamer* (1912), 85 Ohio St. 349, 97 N.E. 602, the court stated that "*[i]f * * * [the injured worker] claims that the injury was caused by the wilful act of the employer or officer or agent * * *, he may * * * sue in court for his damages.*" (Emphasis added.) *Id.* at 404, 97 N.E. at 608.

Obviously, where the employer's conduct falls outside the scope of the Act, the employer cannot avail himself of any of the protections afforded by the Act, such as the immunity provision in R.C. 4123.74. This is not unfair. By choosing to engage in intentional tortious conduct, the employer has forfeited his right to seek refuge in the benevolent provisions of the Workers' Compensation Act. See *Egan, supra,* at 186-187, 25 OBR at 252, 495 N.E. 2d at 914-915 (Douglas, J., concurring in judgment only).

Of course, it is entirely possible that the conduct of the employer in the case now before us was merely negligent or even completely non-culpable. The burden of proving intentional misconduct would reside with appellant. As explained *supra,* however, the question of whether appellee acted intentionally in this case is not before this court.

The reasoning outlined above is also applicable to R.C. 4121.80, the recently enacted statute designed to create a new system for dealing with intentional torts in the workplace. In my view, the statute is an exercise in futility, since its enactment constituted an improper exercise of legislative power. The following analysis is provided as support for this conclusion.

The Industrial Commission was created by the adoption of Section 35, Article II of the Ohio Constitution. *State, ex rel. Kildow,* v. *Indus. Comm.* (1934), 128 Ohio St. 573, 579-580, 1 O.O. 235, 238, 192 N.E. 873, 876. "The State Insurance Fund is a product of our Constitution, and as a necessary incident the Industrial Commission was created by the same constitutional provision, and the General Assembly was therein authorized to grant to the commission broad powers in order that a proper administration of the State Insurance Fund might be realized." *Id.* The Industrial Commission is an administrative agency whose powers and duties are limited to those conferred on it by the provisions of the Constitution and the statutes enacted pursuant thereto. See *State, ex rel. Funtash,* v. *Indus. Comm.* (1951), 154 Ohio St. 497, 43 O.O. 431, 96 N.E. 2d 593, paragraph one of the syllabus. R.C. 4121. 80, which confers certain powers on the commission in cases involving intentional torts, impermissibly enlarges the jurisdiction of the commission to include matters manifestly outside the constitutional grant contained in Section 35, Article II. That section provides in pertinent part:

"*For the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen's employment, laws may be passed* establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state, determining

the terms and conditions upon which payment shall be made therefrom. * * * Laws may be passed establishing a board which may be empowered to classify all occupations, according to their degree of hazard, to fix rates of contribution to such fund according to such classification, and to collect, administer and distribute such fund, and to determine all rights of claimants thereto. * * *'' (Emphasis added.)

It is obvious from the opening phrase of this section that its purpose is to create a source of compensation for workers injured or killed *in the course of their employment.* This court has repeatedly held that the purpose of the Workers' Compensation Act, enacted pursuant to this section, is to strike a balance between the interests of the employer and the employee by shielding the former from a suit *in negligence* in exchange for his relinquishment of his common-law defenses. See, *e.g., Blankenship, supra,* at 614, 23 O.O. 3d at 508, 433 N.E. 2d at 577; *State, ex rel. Crawford,* v. *Indus. Comm.* (1924), 110 Ohio St. 271, 274-276, 143 N.E. 574, 575. Injuries resulting from an employer's intentional torts, even though committed at the workplace, are utterly outside the scope of the purposes intended to be achieved by Section 35 and by the Act. *Such injuries are totally unrelated to the fact of employment.* When an employer intentionally harms his employee, that act effects a complete breach of the employment relationship, and for purposes of the legal remedy for such an injury, the two parties are not employer and employee, but intentional tortfeasor and victim. If the victim brings an intentional tort suit against the tortfeasor, it is a tort action like any other. The employer has forfeited his status as such and all the attendant protections fall away. The Industrial Commission can have no ju-

risdiction over such an action. The lawsuit has no bearing upon any question relating to employment. The jurisdiction of the commission is limited to the matters delineated in Section 35, Article II. The General Assembly has no power to confer jurisdiction on the commission except as authorized by that constitutional provision. See *Crawford, supra,* at 276, 143 N.E. at 575-576. Section 35 concerns itself solely with compensation for injuries arising from employment. R.C. 4121.80 concerns itself solely with injuries which by their nature have no connection whatsoever with the fact of employment. In enacting R.C. 4121.80, the General Assembly has exceeded the scope of the authority granted to it by the constitutional amendment, and the statute is, therefore, void as an improper exercise of legislative power.

Even if R.C. 4121.80 were not invalid for this reason, it contains many other potential infirmities which, I am sure, will be explored in subsequent cases. However, I feel compelled to address some grave concerns I have regarding the new legislative definition of "intentional tort" contained in R.C. 4121.80(G)(1). This definition provides as follows:

" 'Intentional tort' is an act committed with the intent to injure another or committed with the belief that the injury is substantially certain to occur. *

"* * *

" 'Substantially certain' means that an employer acts *with deliberate intent to cause an employee to suffer injury, disease, condition, or death.''* (Emphasis added.)

Under this definition, an employer, in order to be held civilly liable, must have proceeded *deliberately* to cause death or injury to an employee. The implications of this standard are astounding. Legally speaking, an employer is

now subject to civil liability *only if his actions amount to criminal assault or murder.*

R.C. 2903.02(A), setting forth the crime of murder, states: "No person shall purposely cause the death of another." "Purposely" is defined in R.C. 2901.22(A), which provides that "[a] person acts purposely when it is his specific intention to cause a certain result * * *." R.C. 4121.80(G)(1) requires that the employer act with "deliberate intent to cause an employee to suffer * * * death." Anything less will not result in civil liability. Thus, an employer is now civilly liable for an employee's death only if he commits murder,[6] and even then his liability is substantially limited by other provisions of R.C. 4121.80.

The same is true of an employer who acts intentionally to cause injury to an employee. In fact, the criminal assault statutes require a *less* culpable mental state than R.C. 4121.80. R.C. 2903.11 sets forth the elements of felonious assault as follows:

"(A)  No person shall *knowingly*:
"(1)  Cause serious physical harm to another * * *." (Emphasis added.)

"Knowingly" is defined in R.C. 2901.22(B): "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

"Knowingly" is a less culpable state than "purposely." R.C. 2901.22 (E); *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382, 18 O.O. 3d 528, 415 N.E. 2d 303. To act "knowingly," a person need not act with deliberate intent. *State* v. *Wenger* (1979), 58 Ohio St. 2d 336, 339, 12 O.O. 3d 309, 311, 390 N.E. 2d 801, 803, at fn. 3. Thus, an employer may actually be guilty of criminal assault but exempt from civil liability under R.C. 4121.80(G)(1)!

The views I express today are the result of an arduous internal debate. I write at such length because I believe that this area involves concepts with which this court must struggle for years to come. The main point I hope I have made is that intentionally inflicted injuries are not "different" simply by virtue of the fact that they occur in the workplace. The idea that such injuries are special or distinct from other intentionally inflicted injuries has somehow become fixed. That erroneous notion is the source of many of the conceptual difficulties that seem to plague us in this area. I believe that the controversies surrounding these issues would subside to a great extent if the fundamental distinction between truly work-related injuries and intentional torts were more clearly understood.

Accordingly, I dissent. I would reverse the judgment of the court of appeals and remand this cause to the trial court for a consideration of appellant's third-party complaint, as amended.

---

[6] There are two apparent exceptions to this deliberate intent-to-injure requirement. They are contained in the middle paragraph of R.C. 4121.80(G)(1):

"Deliberate removal by the employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance is evidence, the presumption of which may be rebutted, of an act committed with the intent to injure another if injury or an occupational disease or condition occurs as a direct result."