DIRKSING, Admr., Appellant,

v.

BLUE CHIP ARCHITECTURAL PRODUCTS, INC. et al., Appellees.

[Cite as *Dirksing v. Blue Chip Architectural Products, Inc.* (1994), 100 Ohio App.3d 213.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA93–08–156.

Decided Nov. 7, 1994.

214

*John H. Metz*, for appellant.

*Taft, Stettinius & Hollister* and *James M. Hall, Jr.,* for appellees Blue Chip Architectural Products, Inc., WCI/Waltek, Inc. and Keith G. Smith.

*Kenneth B. Flacks,* for appellee Blue Chip Erectors, Inc.

*Dinsmore & Shohl* and *Stephen K. Shaw,* for appellee Frank Messer & Sons Construction Company.

---

KOEHLER, Judge.

Plaintiff-appellant, William P. Dirksing, administrator of the estate of John L. Dirksing ("Dirksing"), deceased, appeals a decision of the Butler County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Blue Chip Architectural Products, Inc. ("BCAP"); Blue Chip Erectors, Inc. ("BCE"); Welling and Co. ("Welling") and its successor WCI/Waltek ("Waltek") [1]; Frank Messer and Sons Construction Co. ("Messer"); and Keith G. Smith.

Dirksing, appellant's decedent, was a college student working during the summer as a "helper" for BCAP on the Champion Paper Knightsbridge construction project. On May 18, 1990, Dirksing died after falling through a skylight. He was not wearing a safety belt and there were no safety nets under the skylight.

Messer was the general contractor on the Knightsbridge project. Messer subcontracted with Welling for the installation of the skylights. Welling, in turn, contracted with BCAP to do the labor. BCAP and BCE do the actual field work for projects in which Welling is involved. Keith Smith is an officer and/or shareholder in Welling, BCAP and BCE.

Appellant, Dirksing's father, filed a wrongful death action against BCAP, BCE, Welling, and Messer, alleging causes of action for intentional tort and negligence. Subsequently, appellant sought leave to file an amended complaint naming Keith Smith as an additional defendant and adding claims that (1) BCAP could be held liable for negligence because the Ohio Bureau of Workers' Compensation had paid no compensation for Dirksing's death and therefore BCAP was not entitled to immunity under the workers' compensation statutes; (2) Welling, BCE, and Keith Smith could be held liable on an "alter ego" theory for BCAP's negligence; and (3) Welling, BCE, and Keith Smith could be held liable for their own negligence. The trial court never specifically granted appellant leave to file the amended complaint. However, it did address the issues raised in the amended complaint on motions for summary judgment. The trial court granted summary

---

1. We will refer to Welling and Waltek collectively as "Welling."

judgment in favor of all defendants on all issues raised by appellant. This appeal followed.

Appellant presents seven assignments of error for review. We will address the issues raised by appellant by subject matter and therefore will address the assignments of error out of order.

## I

### Intentional Tort

In his first assignment of error, appellant states that the trial court erred in granting summary judgment in favor of BCAP, BCE, Welling, and Keith Smith on the issue of intentional tort. Appellant argues that reasonable minds could differ as to whether Dirksing's employer knew that injury was substantially certain to occur. We find this assignment of error to be well taken.

The standard for proving an intentional tort is set forth in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraphs one and two of the syllabus, which states:

"1. * * * [I]n order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. * * *

"2. To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. * * *"

The elements of an intentional tort may be proven by circumstantial evidence. *Adams v. Aluchem, Inc.* (1992), 78 Ohio App.3d 261, 264, 604 N.E.2d

254, 255–256. Appellant's evidence, if believed, shows that on the day of the accident, Dirksing was assisting Keith Smith's sons, Mark and Brant, as they worked on two skylights. Dirksing was working with Brant Smith in finishing a nearly completed skylight when Mark Smith asked Dirksing to help move a piece of plywood that Mark Smith had been kneeling on while working on the other skylight. That skylight was only partially covered with glass. Mark Smith, who was the only one wearing a safety belt, turned away from Dirksing as he prepared to move the plywood. When Mark Smith heard Dirksing say something, he turned around to see Dirksing falling backward through the skylight to the floor of the atrium below.

Before the start of skylight installation, Messer had asked Welling to put up planking or safety nets. Welling, to Messer's satisfaction, had replied that employees would be tied off using safety belts and lanyards. Mike Monk was the supervisor in charge on the day of the accident. Although Monk claimed to be familiar with OSHA regulations, he testified that only someone working directly over an opening needed to use a safety belt. Therefore, Mark Smith was the only employee who was tied off. However, OSHA regulations state that anyone working within six feet of an opening should be tied off. In fact, testimony showed that there was no place to which a safety belt could be properly attached. Mark Smith was tied off to the skylight frame, which is improper under OSHA regulations. Further, there was a twenty-one to twenty-four inch guardrail around the skylight which would hit the average person at the knee, and the roof was made of corrugated metal which could be slippery.

Monk had hired Dirksing and provided him with only general safety information. Monk was not up on the roof when the accident occurred, although he had been there earlier that day. Tom Estes, the most experienced employee, had left the roof to work on an equipment problem, leaving behind only Dirksing and Brant Smith, both of whom were inexperienced, and Mark Smith, who had a couple of years' field experience.

Appellant also presented evidence that Welling, BCAP, and BCE have histories of OSHA violations, some of which were for failure to provide guardrails and failure to provide adequate fall protection. Appellant presented the affidavits and depositions of two well-qualified experts who stated that, given BCAP's policies, a fall was only a matter of time. One stated in his affidavit:

"Monk was obviously not familiar with safety belts, life lines, and lanyards. His depositions clearly indicated he did not even now [sic] how to put a safety belt on properly and how to use the lanyards. Monk seems to be unaware of the basic requirements for using safety belts and lanyards as fall protection; all of this in spite of the company being cited for failure to use safety belts properly as fall protection. The specific failures to even know of the most basic requirements

makes it clear that the argument made by Blue Chip Architectual [*sic* ] Products, Inc. that safety belts are only required when an employee is somehow 'working directly over the hole' is a ludicrous and unbelievable contention. In more than 20 years of safety and health experience in the construction industry, I have never heard anyone take this position and it is difficult to give it any credence at all.

" * * *

"[T]he mode of doing business, as exhibited by Blue Chip Architectual [*sic*] Products, Inc., i.e. in delegating their safety compliance to Raymond 'Mike' Monk, who does not exhibit the necessary understanding of the OSHA regulations applicable to skylights, creates a substantial certainty that the continued corporate safety policy of requiring safety belt and lanyard use only when working directly over the skylight opening will result in harm or death to employees.

" * * *

"Additionally, I have reviewed the certified copy of the OSHA violation histories for Welling & Co.; Blue Chip Architectual [*sic*] Products, Inc. and Blue Chip Erectors. A corporation that has been cited for past OSHA fall protection violations * * *, yet continues to fail to comply with OSHA fall protection regulations, creates a substantial certainty to cause harm to an employee of said corporation."

The trial court did not even mention the expert opinions in its decision. Appellees argue that the expert opinions do not preclude summary judgment. However, these arguments are simply attacks on the experts' credibility.

Appellees also argue that evidence of prior OSHA violations is not relevant to the issue of whether an employer committed an intentional tort. Appellees rely upon *Ganobcik v. Industrial First, Inc.* (1991), 72 Ohio App.3d 619, 595 N.E.2d 951, in which the executor of the estate of an employee who fell while working on a construction site sued the employer for intentional tort. The case went to trial and the jury returned a verdict in favor of the employer. On appeal, the executor argued that the trial court erred in excluding evidence that the employer had been cited several times by OSHA for failing to provide fall protection. The Eighth District Court of Appeals held that the trial court did not abuse its discretion since "the five proffered citations were not shown to have factual similarity to this matter, and therefore were not demonstrated to have probative value." *Id.* at 629, 595 N.E.2d at 958.

We do not find *Ganobcik* to be persuasive, and we decline to follow it. We can find no other case citing it for the proposition that previous OSHA citations are not relevant. Our view is that the concerns expressed by the *Ganobcik* court go more toward the weight of the evidence than its relevance. Appellant presented

evidence tending to show that Welling, BCAP, and BCE were all alter egos of Keith Smith. Therefore, this court finds that evidence of prior OSHA citations is relevant to the issue of Dirksing's employer's knowledge.

Additionally, appellees place great reliance on the fact that Keith Smith's sons were also on the roof. However, Mark Smith was tied off and Brant Smith was assigned to work on a skylight that was already filled with glass. Dirksing was assigned to help, and he was the only employee likely to be moving about the roof. Construing the circumstantial evidence most strongly in appellant's favor, we conclude that reasonable minds could differ as to whether Dirksing's employer knew that an injury was substantially certain to occur. Therefore, summary judgment is improper. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47–48. Appellant's first assignment of error is sustained.

## II

### General Contractor Liability

In his third assignment of error, appellant states that the trial court erred in granting summary judgment in favor of Messer. Appellant argues that Messer actively participated in and exercised sufficient control over the subcontractor's work to establish liability. We find this assignment of error is not well taken.

In *Hirschbach v. Cincinnati Gas & Elec. Co.* (1983), 6 Ohio St.3d 206, 6 OBR 259, 452 N.E.2d 326, the Ohio Supreme Court stated in the syllabus:

"One who engages the services of an independent contractor, and who actually participates in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, can be held responsible for the injury or death of an employee of the independent contractor."

Subsequently, the Supreme Court decided *Cafferkey v. Turner Constr. Co.* (1986), 21 Ohio St.3d 110, 21 OBR 416, 488 N.E.2d 189, holding in the syllabus that "[a] general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work."

In that case, Turner was the general contractor on a construction project. Turner subcontracted with Millgard Corp. to drill and install the caisson foundations necessary to support the structure. The decedent, a Millgard employee, died due to injuries he received in an explosion caused by Millgard's drilling. Turner's assistant superintendent was nearby when Millgard employees made the

decisions which ultimately led to the explosion. However, he was not consulted about any of these decisions and, according to Millgard's project superintendent, "had no say to anything." The trial court granted summary judgment in favor of Turner and the Supreme Court affirmed. The Supreme Court specifically stated that neither Turner's general concern for safety nor its contractual right to monitor and coordinate the activities of all subcontractors was the kind of active participation legally required to create a duty of care to the subcontractors' employees. *Id.* at 112–113, 21 OBR at 418–419, 488 N.E.2d at 191–192.

In the present case, the facts are similar to those in *Cafferkey*. There was no evidence that Messer actively participated in the installation of the skylights. Messer did not control how the subcontractors performed their work; its role was supervisory. If Messer saw a subcontractor's employee committing a safety violation, it reserved the right to insist the subcontractor correct that violation, but Messer stayed out of the subcontractor's daily operations. For example, once Messer determined that BCAP's employees would be using fall protection, it did not interfere in the work. Appellant relies heavily on evidence that Messer had the opportunity to rent nets used by the subcontractor working in the atrium prior to BCAP and knew that there were no nets after that subcontractor removed them. However, Messer was not under a duty to provide nets, the offer was speculative, and BCAP had assured Messer that its employees would use safety belts. Since Messer did not actively participate in the subcontractor's work, it did not owe the subcontractor's employees a duty of care. Accord *Gross v. Western–Southern Life Ins. Co.* (1993), 85 Ohio App.3d 662, 621 N.E.2d 412, certiorari denied (1994), —— U.S. ——, 114 S.Ct. 1553, 128 L.Ed.2d 202; *Betzner v. Navistar Internatl. Transp. Corp.* (1991), 77 Ohio App.3d 611, 603 N.E.2d 256; *Curless v. Lathrop Co.* (1989), 65 Ohio App.3d 377, 583 N.E.2d 1367.

Appellant argues that the present case differs from *Cafferkey* in one respect: Messer has an extensive safety program. In *Cafferkey,* the general contractor's safety program was a "one-page list of general safety requirements," which was "nothing more than a handy, brief reference sheet to remind subcontractors about the fundamental 'dos and don'ts' at the construction site." *Id.* at 113, 21 OBR at 418–419, 488 N.E.2d at 192. Appellant argues that because Messer undertook a comprehensive safety program, a jury could have found it exercised sufficient control over the operation to establish liability.

Appellant relies upon *Whitelock v. Cleveland Clinic Foundation* (Apr. 2, 1992), Cuyahoga App. Nos. 60084 and 60610, unreported, 1992 WL 67624 ("*Whitelock I*"), in which Gilbane Building Co. was the project manager for construction of a clinic building. One of its subcontractor's employees was injured on the job. The employee sued Gilbane and a jury found in the employee's favor. On appeal, Gilbane argued that the trial court erred in denying its motion for a directed

verdict, relying on *Hirschbach* and *Cafferkey*. The court of appeals concluded that Gilbane was not entitled to judgment as a matter of law since that case was distinguishable from *Cafferkey*. It stated: "In the instant case, Gilbane wrote a detailed safety program, was involved in inspections to uncover unsafe conditions, and had the authority to actually dictate the manner in which a task was performed." *Id.* at 4.

The court of appeals certified the case to the Supreme Court. In *Whitelock v. Gilbane Bldg. Co.* (1993), 66 Ohio St.3d 594, 613 N.E.2d 1032 ("*Whitelock II*"), the Supreme Court dismissed the case as improperly certified. The court did, however, briefly discuss the merits of the case. It noted that the court of appeals found that Gilbane had a detailed safety program and the ability to actually dictate the manner in which a task was performed. The Supreme Court stated: "In so finding, the court of appeals distinguished, on its facts, *Cafferkey* from the case at bar. On this factual question we will not substitute our judgment for the judgment of the trial court, even if our judgment might differ from that of the court of appeals." *Whitelock II* at 598, 613 N.E.2d at 1034–1035.

We do not find the *Whitelock* cases to be persuasive since in the present case we do not find *Cafferkey* to be distinguishable. Though Messer did have an extensive safety program, the evidence does not show that it had the ability to dictate the manner in which the skylights were installed. Further, we find the premise behind *Whitelock I* to be questionable. In *Whitelock II*, the Supreme Court indicated that it was bound by a factual finding with which it did not agree.

Appellant sets forth numerous other theories under which he argues that Messer could be found liable. However, these theories rely on law that is inapplicable or law from other states, and they are clearly attempts to circumvent *Cafferkey*. After construing the evidence most strongly in appellant's favor, we conclude that reasonable minds could reach but one conclusion—that Messer did not owe Dirksing a duty of care. Accordingly, the trial court did not err in granting summary judgment in favor of Messer, and appellant's third assignment of error is overruled.

## III

### Loaned Servant

In his sixth assignment of error, appellant states that the trial court erred in concluding that Monk was a "loaned servant" working for BCAP on the Champion project and that BCE is not responsible for any negligence Monk might have committed. Appellant argues that the determination whether someone is a "loaned servant" and who had the right to control that servant are questions of fact for the jury. We find this assignment of error is not well taken.

"When one party loans his servant to another for a particular employment in the business and under the direction of the latter, the servant, for anything done in that employment, must be regarded as the servant of the party to whom he is loaned, although he remains the general servant of the party who loaned him." *Halkias v. Wilkoff* (1943), 141 Ohio St. 139, 25 O.O. 257, 47 N.E.2d 199, paragraph four of the syllabus, overruled on other grounds in *Helmick v. Republic–Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 529 N.E.2d 464.

" '[I]n determining whether, in respect of a particular act, a servant, in the general employment of one person, who has been loaned for the time being to another is the servant of the original employer or the person to whom he has been loaned, the test is whether in the particular service which he is engaged to perform, the servant continues liable to the direction and control of his general employer or becomes subject to that of the person to whom he is lent,—whether the latter is in control as proprietor so that he can at any time stop or continue the work and determine the way in which it is to be done, with reference not only to the result reached but to the method of reaching it.' " (Citations omitted.) *Halkias, supra,* at 152, 25 O.O. at 262, 47 N.E.2d at 205, quoting 35 American Jurisprudence 970, Section 541.

In finding that Monk was a loaned servant, the trial court stated:

"In this case, Mike Monk worked primarily for BCE, but was loaned out to BCAP on non-union jobs. He performed the same work for both companies, which was general field superintendence. * * * BCE did not have a contract to perform work on the Champion project and received no benefit from Monk working on the project. Although Monk was the senior person on the job site that day for BCAP, it would be unreasonable to believe that he was still working for BCE simply because he was not under the direct direction of someone who had a more senior position than Monk had. Therefore the Court finds that reasonable minds could only find that Monk was a 'loaned servant' working for BCAP on the Champion project and BCE is not responsible for any negligence Monk might have committed while working on the Champion site."

■ We agree with the trial court's analysis. Appellant cites three cases for the proposition that the loaned servant issue cannot be decided on summary judgment, none of which support that argument. When there is no issue of material fact, the question whether an individual is a borrowed servant can be decided as a matter of law. See *Mulford v. Columbus & S. Ohio Elec. Co.* (Jan. 12, 1994), Athens App. No. CA–1548, unreported, 1994 WL 11426; *Cornelius v. B.G. Danis Co., Inc.* (Nov. 14, 1990), Hamilton App. No. C–890500, unreported, 1990 WL 177187; *Carpenter v. Shape Form, Inc.* (Jan. 16, 1990), Madison App. No. CA89–07–010, unreported, 1990 WL 2336. Accordingly, appellant's sixth assignment of error is overruled.

## IV

### Statute of Limitations and Relation Back of Pleading

 In his seventh assignment of error, appellant argues that the trial court erred in holding that the statute of limitations had run as to Keith Smith. Appellant argues that even though his amended complaint, which added Keith Smith as a defendant, was not filed until after the statute of limitations had run, the amendment should relate back pursuant to Civ.R. 15(C). We find this assignment of error to be well taken.

Civ.R. 15(C) provides:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him."

 The primary purpose of Civ.R. 15(C) is to preserve actions which, through mistaken identity or misnomer, have been filed against the wrong person. *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 101, 529 N.E.2d 449, 461–462. The decision whether to allow an amendment to relate back under Civ.R. 15(C) lies within the discretion of the trial court. *Patterson v. V & M Auto Body* (1992), 63 Ohio St.3d 573, 576, 589 N.E.2d 1306, 1309. Civ.R. 15(C) can be used to add parties to an action after the running of the statute of limitations. *Smith v. Klem* (1983), 6 Ohio St.3d 16, 6 OBR 13, 450 N.E.2d 1171; *Kosa v. Pruchinsky* (1992), 82 Ohio App.3d 649, 653, 612 N.E.2d 1291, 1293–1294.

The record shows that Keith Smith had notice of the action and would not be prejudiced in maintaining his defense because he was already involved in the defense of BCAP, BCE, and Welling before the amended complaint was filed. The record also shows that the statute of limitations would have run on May 18, 1992. Although some discovery had been conducted prior to that time which indicated Smith's relationship to the three companies, Keith Smith's deposition was not taken until August 13, 1992 and other depositions continued to be taken until February 1993. Accordingly, the record shows that appellant did not have sufficient information to include Smith until after the statute of limitations had run. Since all the requirements of Civ.R. 15(C) were met, we hold that the trial

court abused its discretion in concluding that the amended complaint did not relate back and in granting summary judgment in favor of Keith Smith. See *Patterson, supra,* at 576, 589 N.E.2d at 1309. Appellant's seventh assignment of error is sustained.

## V

## Alter Ego and Discovery

The concept that a corporation is a legal entity, separate and apart from the natural persons who compose it, is a legal fiction designed to facilitate the transacting of business. However, when the corporate form is used to subvert the intent and policy of this fiction, it may be disregarded. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 287, 617 N.E.2d 1075, 1085; *Ohio Bur. of Workers' Comp. v. Widenmeyer Elec. Co.* (1991), 72 Ohio App.3d 100, 105, 593 N.E.2d 468, 471. The corporate "veil" can be pierced and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity. Courts will permit individual shareholder liability if the shareholder is indistinguishable from or the "alter ego" of the corporation itself. *Belvedere, supra,* at 287, 617 N.E.2d at 1085.

The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own; (2) control over the corporation by those to be held liable was exercised to commit fraud or an illegal action against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from that control or wrong. *Id.* at paragraph three of the syllabus. "The factors to be considered in determining when the above principles should be applied include the observance of corporate formalities, undercapitalization, fraud, and the result of unjust or inequitable consequences in the event the corporate fiction were retained." *Link v. Leadworks Corp.* (1992), 79 Ohio App.3d 735, 744, 607 N.E.2d 1140, 1146. The party seeking to impose individual liability on the shareholder bears the burden to prove the grounds for piercing the corporate veil. *LeRoux's Billyle Supper Club v. Ma* (1991), 77 Ohio App.3d 417, 423, 602 N.E.2d 685, 689–690.

In his fourth assignment of error, appellant states that the trial court erred in denying his motion to compel discovery of financial information about Keith Smith, Welling, BCAP, and BCE. Appellant argues that the trial court prevented him from proving his case. We find this assignment of error to be well taken.

Management of the discovery process lies within the discretion of the trial court. *State ex rel. Daggett v. Gessaman* (1973), 34 Ohio St.2d 55, 63 O.O.2d 88, 295 N.E.2d 659, paragraph one of the syllabus; *Glick v. Marler* (1992), 82 Ohio App.3d 752, 758, 613 N.E.2d 254, 258–259. The record shows that appellant had filed interrogatories seeking financial information about Waltek, BCAP, and BCE dating back to 1987. Appellees eventually supplied information from 1990, but refused to give information from before that time, claiming it was irrelevant. Appellant filed a motion to compel, which the trial court overruled. The trial court had already granted partial summary judgment to appellees on appellant's intentional tort claim. It found that even if Keith Smith, Welling, BCAP, and BCE were all alter egos, appellant still had to prove an intentional tort to recover against any of them. Since the trial could have concluded that appellant had not proven an intentional tort, the alter ego issue was no longer present in the case.

However, we have already concluded that the trial court erred in granting summary judgment on the intentional tort claim. Since appellant bears the burden of proof on the alter ego issue, he should not be denied the opportunity to discover any relevant information, and the trial court should decide what is relevant, not appellees. Accordingly, we conclude that the trial court abused its discretion in overruling appellant's motion to compel discovery. We sustain appellant's fourth assignment of error, and we remand the matter to the trial court to decide the motion to compel on its merits.

In his second assignment of error, appellant states that the trial court erred in granting summary judgment in favor of Welling and BCE. Appellant argues that if appellees "are going to play a pea-in-shell game with the three corporations[,] only one corporation may at any one time be the 'employer' of John Dirksing." Therefore, appellant contends, the remaining corporations would not be immune from liability under the workers' compensation statutes in a negligence suit. We find this assignment of error to be well taken, although not precisely for the reason advanced by appellant.

Despite the trial court's decision denying appellant's motion to compel, he did conduct some discovery on the corporate workings of Welling, BCAP, and BCE. The record shows that Keith Smith is the president and sole shareholder of Waltek. He originally worked for Welling, in which he was a minority shareholder. Keith Smith later formed a corporation to acquire Welling's assets, then changed Welling's name to Waltek. Keith Smith is also the vice president and sole shareholder of BCAP. He is the assistant treasurer of BCE in which Waltek owns forty percent of the shares. Further, Keith Smith made and received personal loans to and from the corporations.

Waltek is in the exterior wall manufacturing and contracting business. In the late 1980s, Smith formed BCAP because he saw a need to establish a manufactur-

ing entity separate from the contracting entity. BCAP and BCE are used to do the actual field work for projects in which Waltek is involved. BCE was the union shop, used in union jobs, and BCAP was the nonunion shop. Although Keith Smith is not involved in the daily operation of BCAP or BCE, Waltek and BCE share office space. BCAP has a separate address which is their "shop" where tools and equipment are kept.

Robert Sanders is the vice president and safety director of Waltek. He is the president and treasurer of BCAP and the treasurer of BCE. He was also the treasurer and vice president of WCI Acquisitions. He originally worked for Welling as a controller. Robert Sanders stated that his duties were basically the same with all three corporations. He also stated that he is paid by Waltek, not BCAP, even though he is BCAP's president and that no white collar employees are paid by BCAP. He indicated that there were "informal loans" between the corporations and that Welling's safety policy covered all three corporations.

Carol Smith (no relation to Keith Smith) previously worked for Welling and is now the controller for Waltek. She does accounting for Waltek, BCAP, and BCE and is the secretary for the three corporations. However, Carol Smith was unsure what offices she held in the corporations. Carol Smith testified she became an officer at Keith Smith's request and, though she signed the corporate minutes, she could not recall attending any corporate meetings.

Monk, Dirksing's supervisor, was an employee of BCE, "loaned out" to BCAP for the Champion Paper job. Estes, a union fabricator working on the roof the day of the accident, was unsure of the company for whom he worked, although he knew his paychecks did not come from Waltek. Estes indicated that he had driven a truck with BCAP on the side to BCE jobs. Even Brant Smith, Keith Smith's son, was not entirely sure of the company for which he worked.

Accordingly, we conclude that reasonable minds could differ as to whether the corporations had a separate existence. Therefore, the jury could properly find that some or all of the corporations are alter egos of the shareholders, and the trial court erred in granting summary judgment in favor of Welling and BCE.

■ However, appellant's argument regarding the effect of such a decision by the jury is erroneous. When a corporation is found to be the alter ego of the shareholders, the corporate forms are disregarded and the shareholder and the corporation are treated as one and the same. *Federated Dept. Stores, Inc. v. J.V.B. Industries, Inc.* (C.A.6, 1990), 894 F.2d 862, 870–871; *Wildlife Internationale, Inc. v. Clements* (S.D.Ohio 1984), 591 F.Supp. 1542, 1550. Therefore, if the jury were to decide that the corporations were alter egos, they would all be treated as Dirksing's employer. They would all have the protection of the

Workers' Compensation Act and could not be found liable for negligence, but could be found liable for committing an intentional tort.

However, if the jury were to conclude that the corporations are not alter egos, Welling could be found liable for negligence on the same basis as a general contractor under *Cafferkey* and *Hirschbach*, an issue which the trial court did not address. BCE could only be found liable for negligence based upon Monk's conduct, and we have already concluded that the trial court properly granted summary judgment in favor of BCE on a negligence theory since Monk was a loaned servant controlled by BCAP. With those caveats, we sustain appellant's second assignment of error.

## VI

### Constitutionality of the Workers' Compensation Act

In his fifth assignment of error, appellant states that the trial court erred in ruling that R.C. 4123.74 is constitutional and does not violate the Ohio or federal Constitutions. Appellant argues that the statute denies beneficiaries under the wrongful death statutes who are not dependents as defined in the Workers' Compensation Act a meaningful remedy and violates fundamental rights to equal protection and due process. We find this assignment of error is not well taken.

R.C. 4123.74, as it read at the time of Dirksing's death, provided:

"[E]mployers who comply with section 4123.35 of the Revised Code shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of his employment, or for any death resulting from such injury, occupational disease, or bodily condition occurring during the period covered by such premium so paid into the state insurance fund, or during the interval of time in which such employer is permitted to pay such compensation directly to his injured employees or the dependents of his killed employees, whether or not such injury, occupational disease, bodily condition, or death is compensable under sections 4123.01 to 4123.94 of the Revised Code."

This statute implements the constitutional mandate in Section 35, Article II of the Ohio Constitution, *Blankenship v. Cincinnati Milacron Chemicals* (1982), 69 Ohio St.2d 608, 611, 23 O.O.3d 504, 506, 433 N.E.2d 572, 575, certiorari denied (1982), 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110, and contains identical language. Consequently, appellant's claim that the exclusivity provision in R.C. 4123.74 violates the Ohio Constitution is erroneous since it is specifically provided for in the Ohio Constitution. See *Taylor v. Academy Iron & Metal Co.* (1988), 36 Ohio St.3d 149, 151, 522 N.E.2d 464, 466, fn. 1.

Further, appellant specifically argues that the statute violates Section 19a, Article I of the Ohio Constitution which provides that "[t]he amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law." We disagree. While Section 19a provides that damages may not be limited, there is no prohibition against changing the standard of liability to be proved in a wrongful death case. In *Gibbon v. Young Women's Christian Assn. of Hamilton* (1960), 170 Ohio St. 280, 10 O.O.2d 334, 164 N.E.2d 563, the Ohio Supreme Court held that a charitable organization was immune from a wrongful death suit. In reaching this conclusion, it discussed Section 19a, stating:

"From this constitutional provision and those of Article II, it would appear that our General Assembly has broad power to enact laws relating to the liability or immunity therefrom of religious, charitable and educational institutions for injuries, or wrongful death, to beneficiaries caused by the negligence of employees, or requiring proof of gross neglect in such cases, or financially limiting damages for injuries so sustained, but it may not financially limit damages in wrongful death actions lawfully brought." *Id.* at 285, 10 O.O.2d at 337–338, 164 N.E.2d at 567. (The Supreme Court subsequently abolished the doctrine of charitable immunity on public policy grounds without mentioning Section 19a. *Albritton v. Neighborhood Centers Assn. for Child Development* [1984], 12 Ohio St.3d 210, 12 OBR 295, 466 N.E.2d 867.) See, also *Kennedy v. Byers* (1923), 107 Ohio St. 90, 96, 140 N.E. 630, 632–633 (Section 19a applies only to the amount of pecuniary damages recoverable).

Exclusivity provisions of workers' compensation statutes have repeatedly been found to be constitutional. *Goetz v. Aetna Casualty & Surety Co.* (C.A.9, 1983), 710 F.2d 561, 564. In *Allen v. Eastman Kodak Co.* (1976), 50 Ohio App.2d 216, 4 O.O.3d 179, 362 N.E.2d 665, the Tenth District Court of Appeals concluded that Ohio's workers' compensation laws, as enacted in its Constitution and its statutes, do not violate the Equal Protection or Due Process provisions of the United States Constitution. It quoted from *New York Central RR. Co. v. White* (1916), 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667, in which the United States Supreme Court found the exclusivity provisions of the New York workers' compensation laws to be constitutional. In *White*, the court stated:

"The close relation of the rules governing responsibility as between employer and employee to the fundamental rights of liberty and property is, of course, recognized. But those rules, as guides of conduct, are not beyond alteration by legislation in the public interest. No person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit. * * * The common law bases the employer's liability for injuries to the employee upon the ground of negligence; but negligence is merely the disregard of some duty

imposed by law; and the nature and extent of the duty may be modified by legislation, with corresponding change in the test of negligence." (Citations omitted.) *Id.* at 197–198, 37 S.Ct. at 250, 61 L.Ed. at 672.

While not addressing the specific issue raised in this appeal, Ohio courts have used the exclusivity provisions of the workers' compensation laws to preclude third-party claims. The case most on point is *State ex rel. Allied Chemical Corp. v. Earhart* (1974), 37 Ohio St.2d 153, 66 O.O.2d 313, 310 N.E.2d 230, in which the employee's mother filed a wrongful death suit against a complying employer. When the employer's motion to dismiss was overruled by the trial court, it sought a writ of prohibition from the court of appeals to prevent the trial judge from assuming jurisdiction over the wrongful death action. The court of appeals denied the writ. The Supreme Court reversed the decision of the appellate court and granted the writ, concluding that, pursuant to Section 35, Article II, the rights of the employee or the employee's legal representative are determined by the Industrial Commission. Courts are without jurisdiction to entertain any action for damages for injury or death by the employee or the employee's representative against a complying employer. *Id.* at 155–156, 66 O.O.2d at 314–315, 310 N.E.2d at 231–232.

In *Taylor, supra,* at 149, 522 N.E.2d at 464, the Supreme Court held that a third-party tortfeasor could not sue a complying employer, even for an intentional tort, related to an employee's work-related injury. It stated that it agreed with other courts that held that exclusivity provisions "demonstrate the legislature's intention to 'provide against liability of the employer to *anyone* for damages arising from any injury, disease or bodily condition of an employee arising out of his employment[.]' " (Emphasis *sic.*) *Id.* at 152, 522 N.E.2d at 467, quoting *Williams v. Ashland Chem. Co.* (1976), 52 Ohio App.2d 81, 86–87, 6 O.O.3d 56, 58–59, 368 N.E.2d 304, 308–309.

Courts have also held that the immunity provisions in R.C. 4123.74 and Section 35, Article II preclude suits for loss of consortium by the spouse of an injured employee. *Bevis v. Armco Steel Corp.* (1951), 156 Ohio St. 295, 46 O.O. 172, 102 N.E.2d 444; *Rowe v. Riess* (1986), 30 Ohio Misc.2d 28, 30 OBR 292, 506 N.E.2d 1237; *Huston v. Morris* (Mar. 12, 1991), Franklin App. No. 90AP–1009, unreported, 1991 WL 35001; *Roof v. Velsicol Chemical Corp.* (N.D.Ohio 1974), 380 F.Supp. 1373. Similarly, at least one court has held that the immunity extends to a claim for loss of services by parents whose child was killed during the course of the child's employment. *Bankers Indemnity Ins. Co. v. Cleveland Hardware & Forging Co.* (1945), 77 Ohio App. 121, 132, 32 O.O. 395, 399, 62 N.E.2d 180, 184–185.

Courts from other jurisdictions have held that the exclusivity provisions of their workers' compensation laws preclude a wrongful death suit by beneficiaries

of the deceased employee who are not dependents. These cases state that the beneficiaries may recover only if the employee could have recovered had the employee survived. *Stonecipher v. Winn–Rau Corp.* (1976), 218 Kan. 617, 545 P.2d 317; *Evans v. Avery* (1961), 272 Ala. 230, 130 So.2d 373; *Schnall v. 1918 Harmon St. Corp.* (1960), 26 Misc.2d 287, 207 N.Y.S.2d 375; *Salin v. Pacific Gas & Elec. Co.* (1982), 136 Cal.App.3d 185, 185 Cal.Rptr. 899; *Murray Chevrolet Co., Inc. v. Godwin* (1973), 129 Ga.App. 153, 199 S.E.2d 117.

In *West v. Zeibell* (1976), 87 Wash.2d 198, 550 P.2d 522, the Washington Supreme Court rejected a constitutional argument made by parents seeking to recover for the wrongful death of their son. The court stated:

"Plaintiffs' final claim is that if the workmen's compensation act were held to bar recovery * * *, a deprivation of due process and equal protection would result. There can be no vested right, however, in a tort action that can be brought only by virtue of a statute. * * * The Fourteenth Amendment does not prevent a state from amending or entirely abolishing statutory remedies. * * *" (Citations omitted.) 87 Wash.2d at 202, 550 P.2d at 524.

We conclude after this lengthy survey of the available law that the exclusivity provision in R.C. 4123.74 is constitutional. Further, the trend in most states, including Ohio, is to apply exclusivity provisions expansively to bar any negligence claim, even those of third parties, against a complying employer. This conclusion eliminates the anomalous result that a brother, sister, or parent could recover for wrongful death against an employer but a dependent, such as a spouse or a child, could not. Accordingly, appellant's fifth assignment of error is overruled.

## VII

### Summary

In conclusion, we sustain appellant's first, second, fourth, and seventh assignments of error and overrule his third, fifth, and sixth assignments of error. We affirm that part of the trial court's decision granting summary judgment in favor of Messer and reverse that part of the decision granting summary judgment in favor of BCAP, BCE, Welling, and Keith Smith.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

WALSH, P.J., and KERNS, J., concur.

JOSEPH D. KERNS, J., retired, of the Second Appellate District, sitting by assignment.