DECISION AND JUDGMENT ENTRY
Laura Cremeans sued the appellees for conversion and various violations of the Ohio Consumer Sales Practices Act ("CSPA") arising out of an aborted purchase of a mobile home. Following a jury trial, the Ross County Court of Common Pleas entered judgment in the appellant's favor on some, but not all, of her claims. This appeal presents six assignments of error for our review:
Assignment of Error No. 1
 Although plaintiff was entitled to $3,630.00 of her deposits of $5,050.00 according to answers to jury interrogatories and plaintiff's compliance with [section] 1345.09 of O.R.C. provisions for treble damages, the court contrary to law refused to treble damages in said entry. There were three C.S.P.A. violations.
Assignment of Error No. 2
 The entry of the court dated 8/13/99 reduces plaintiff's request for attorney fee [sic] on the basis that she did not prevail on all contentions raised in the lawsuit which is contrary to law.
Assignment of Error No. 3
 The entry of the court dated August 13, 1999 states contrary to law that any post-trial attorney's fees are not recoverable as they are not expended in direct pursuit of a Consumer Sales Protection [sic] Act violation.
Assignment of Error No. 4
 The court erred in directing a verdict for the defendant William Robbins at the close of plaintiff's case and against plaintiff as to plaintiff's claims under the Consumer Sales Practices Act.
Assignment of Error No. 5
 The court erred in directing a verdict at the close of plaintiff's case in favor of the defendant, John R. Molnar, stockholder and director of J.M. Mobile 
Modular Homes, Inc. and Rosemarie Molnar, stockholder and secretary-treasurer, who received a salary without performing services, on the issue of piercing the corporate veil as to said defendants.
Assignment of Error No. 6
 The court erred in refusing to give any part of plaintiff's request to use plaintiff's instructions to the jury.
We find no merit to any of the appellant's assignments of error and therefore affirm.
 I.
Appellee John Molnar created J.M. Mobile Modular Homes, Inc. ("JMMMH"), in 1979. For the next thirteen years, Mr. Molnar served as the president and sole shareholder of JMMMH, which did business in Chillicothe. In March 1992, Mr. Molnar entered into an agreement to sell half of the corporation's stock to William Robbins. Under this agreement, Mr. Robbins became president and chief operating officer of JMMMH and obtained full control of the corporation's business affairs. In return, Mr. Robbins guaranteed payment of one-half of the corporations's "existing and future debts and liabilities," including a $187,898.07 debt owed by the corporation to Mr. Molnar. The agreement further provided that Mr. Molnar's wife, Rosemarie Molnar, would serve as the corporation's secretary-treasurer at an annual salary of $60,000. On the same day as the shareholder agreement, Mr. Robbins and Mr. Molnar executed a separate lease agreement. Under the terms of this agreement, Mr. Molnar's personal corporation leased seven acres of property to JMMMH for business use. The lease called for the corporation to pay $24,000 in 1992 and $30,000 per year thereafter. After executing these agreements, Mr. Robbins operated JMMMH on the leased property under the trade name of Chillicothe Home Center.
In late May 1995, appellant Laura Cremeans went to the Chillicothe Home Center to shop for a mobile home. After finding a model she liked, the appellant filled out a mobile home order form. The appellant also completed a credit application for Greentree Financial Servicing, which handled financing for homes sold by Chillicothe Home Center. It is undisputed that the appellant falsified much of the information on the credit application. The appellant paid a $50 non-refundable credit application fee, which was to be applied toward the purchase price of a mobile home if the application was approved. Based on the false information given by the appellant, Greentree approved the appellant for a line of credit.
Two days after approval of her credit application, the appellant returned to the Chillicothe Home Center and signed an agreement to purchase a mobile home. The agreement specified the make and model of the mobile home as a "Champion Ridgeville Manor #150" and listed a base purchase price of $30,150. In addition, the appellant agreed to purchase various "optional equipment," including a "Glamour Bath" package for $300 and a deluxe appliance package for $1,995. The total cash price for the unit, including tax and title, was $34,934. The appellant paid a $5,000 cash deposit, with the remainder of the purchase price to be financed by Greentree.
A few days after she signed the purchase agreement, the appellant received a call from the Chillicothe Home Center. A salesman informed the appellant that the cabinets she ordered were unavailable and that a different style would be installed on the home. Three to four days later, the salesman called again and told the appellant that the tiles and flooring she had chosen were discontinued by the manufacturer. A replacement style would therefore be substituted. The appellant claimed to be unhappy with these changes but decided to go forward with the purchase.
In late June 1995, the appellant returned to the Chillicothe Home Center with her husband, David Cremeans, to complete the purchase of the mobile home. When the appellant arrived, she learned that the home being delivered to her was equipped with skylights. The appellant also saw a document indicating that the home's price was "different" than the price she had previously agreed to pay. Neither the appellant nor her husband wanted skylights on the home and expressed their dissatisfaction to the salesman. During the discussion, Mr. Robbins entered the office and asked what the problem was. The appellant and her husband explained the situation to Mr. Robbins and indicated that they did not want the house as it was being delivered. According to the appellant, Mr. Robbins insisted they take the house as delivered. After a heated discussion, the appellant and her husband told Mr. Robbins that they would not complete the purchase. The appellant claims that Mr. Robbins told them he was "not eating this house" and that they would "play hell getting [their] money back." Mr. Robbins refused later requests by the appellant for a return of her deposit money.
In May 1996, the appellant filed a complaint in the Ross County Court of Common Pleas, naming Mr. Robbins dba Chillicothe Home Center and JMMMH as defendants.[1] The complaint alleged a claim for conversion and various violations of the CSPA (R.C. 1345.01 et seq.). The appellant later amended her complaint to add Mr. Molnar and his wife, Rosemarie, as defendants. The amended complaint alleged that the Molnars were shareholders in JMMMH and that they, along with Mr. Robbins, should be held individually liable for conversion and CSPA violations. The appellant alleged that Mr. Robbins and the Molnars were the "alter ego" of the corporation and that they had "managed the affairs of said corporation and used said corporation so as to convert plaintiff's deposits to their own use * * * and to shield themselves from prospective liability * * *." JMMMH and Mr. Robbins answered and asserted a counterclaim, asserting that they were entitled to retain the appellant's deposit because of her misrepresentations on the credit application and the liquidated damages provision contained in Paragraph 6 of the purchase agreement.[2]
The case proceeded to a jury trial. At the close of the appellant's evidence, the Molnars moved for a directed verdict on the appellant's claims against them. The Molnars argued that the appellant presented no evidence to suggest that they controlled JMMMH and that the appellant should therefore not be permitted to "pierce the corporate veil" and hold them individually liable. The trial court agreed and directed a verdict in favor of the Molnars. Mr. Robbins also moved for a directed verdict on any claims based on a "piercing the corporate veil" theory and on the appellant's CSPA claims based upon Mr. Robbins' acts. The trial court granted the motion concerning the CSPA claims but denied the motion regarding Mr. Robbins' potential liability under a "piercing the corporate veil" theory. The court allowed the jury to consider whether Mr. Robbins could be held individually liable as an "alter ego" of JMMMH.
At the close of all evidence, the trial court instructed the jury regarding the appellant's conversion and CSPA claims. Specifically, the court instructed the jury on seven distinct CSPA violations: (1) JMMMH's failure to give the appellant a receipt for her $5,000 deposit; (2) failure to give the appellant a receipt for her $50 credit-application fee; (3) misrepresenting the availability of the "Glamour Bath" package;[3] (4) misrepresenting the availability of the style of kitchen tile chosen by the appellant; (5) attempting to have the appellant accept a home with skylights she did nor want; (6) misrepresenting the availability of the "deluxe kitchen package" desired by the appellant; and (7) misrepresenting the style of kitchen cabinets the appellant could order. Although the appellant alleged the "unlawful retention" of $5,050 in deposits as a CSPA violation in her complaint, the jury was not instructed that the retention could constitute a CSPA violation. The court also instructed the jury concerning the appellees' counterclaim. The instructions asked the jury to determine whether the deposit money retained by JMMMH represented a reasonable amount of damages for the appellant's breach of the purchase agreement. Finally, the court instructed on the elements of piercing the corporate veil in relation to whether Mr. Robbins could be held personally liable for any of the appellant's claims.
The court submitted the case to the jury through a series of sixteen interrogatories, but did not include a request for a general verdict.[4] The jury's responses indicated that it found three CSPA violations: (1) failing to give the appellant a receipt for her $5,000 deposit, see Ohio Adm. Code 109:4-3-07; (2) misrepresenting the availability of the "glamour bath" package; and (3) attempting to sell the appellant a home with skylights.[5] The jury returned a conflicting set of responses concerning the appellant's conversion claim. While it expressly found that the appellees did not convert the appellant's funds, it also found that JMMMH was entitled to retain only $1,420 of the deposit as damages for the appellant's failure to purchase the home. Based on the jury's responses to the interrogatories, the court ruled in favor of the appellees on the conversion claim and in favor of the appellant on three of the CSPA claims. However, the court entered judgment in the appellant's favor "for the return of a portion of the Plaintiff's down payment which was in excess of the Defendant's [JMMMH] actual damages, namely the sum of $3,630 together with interest thereon * * *." Accordingly, the court awarded the appellant $3,630 of her deposit money, $600 in statutory damages for her CSPA claims, and $3,663.37 in attorney's fees. The appellant then commenced this appeal.
 II.
In her first assignment of error, the appellant challenges the amount of damages awarded by the trial court. The court awarded $3,630, plus interest, representing the amount of the appellant's deposit that JMMMH was ordered to return to the appellant. The court also awarded an additional $600, which represented $200 in statutory damages for each of the three CSPA violations found by the jury. The appellant insists that the trial court should have awarded three times the $3,630 damage award, i.e. treble damages, pursuant to the CSPA. Based on the record before us, we are unable to agree with the appellant.
The CSPA prohibits a supplier from engaging in unfair, deceptive, or unconscionable practices in connection with consumer transactions. See R.C. 1345.02 1345.03. When a supplier commits an unfair, deceptive, or unconscionable practice, the CSPA allows an aggrieved consumer an election of remedies. The consumer may either rescind the transaction or seek damages. See R.C. 1345.09(A) (B). Throughout this case, the appellant has characterized her action as one for damages rather than a rescission of her purchase contract with JMMMH. This contention is incorrect as a matter of law.
Under a damages theory, the plaintiff-consumer seeks to enforce the transaction by placing himself "in as good a monetary position as if the supplier had not committed the unlawful act(s) or practice(s)." Couto v. Gibson, Inc. (Feb. 26, 1992), Athens App. No. 1475, unreported. For example, in a sale-of-goods context, the consumer retains the goods and is compensated for their diminished value resulting from the CSPA violation. See Evans v. Cheek (1989), 65 Ohio App.3d 535,537. Thus, the damages remedy is designed to give an aggrieved plaintiff the benefit of his or her bargain. In contrast, rescission is an equitable remedy under which the plaintiff-consumer does not enforce the transaction. Rather, the plaintiff is returned to his or her original position before entering the contract, i.e. as if the parties had never entered into the transaction. Mid-America Acceptance Corp. v.Lightle (1989), 63 Ohio App.3d 590, 599; Russell v. RicartFord, Inc. (Jan. 7, 1991), Pickaway App. No. 89CA28, unreported. Notwithstanding the appellant's claim that this is a damages action, the relief she sought shows that she pursued rescission. The appellant refused to purchase the mobile home as she had previously agreed and asked for her money back. The appellant therefore sought to avoid performance of the contract and recoup monies she had already paid. This constitutes an attempt to rescind the purchase contract. See Spears v. Voss Chevrolet, Inc. (Dec. 16, 1986), Montgomery App. No. 9522, unreported (consumer's action of returning a van to dealer, discontinuing payment, and seeking restitution of trade-in and deposit was election of rescission). The appellant is not, as a matter of law, entitled to compensatory damages in addition to having the contract cancelled. R.C. 1345.09(B); Clemens v. Duwel (1995),100 Ohio App.3d 423, 433. While a consumer who elects rescission "is entitled to be restored the amounts paid to the [violating] party, he is not entitled to three times that amount." Lightle, supra, 63 Ohio App.3d at 599. Accordingly, the appellant's first assignment of error is meritless).[6]
Furthermore, even if the appellant properly elected a damages remedy, treble damages are not appropriate. The trial court instructed the jury only on the conversion claim as a theory for recovery of the deposit money. There was no instruction that the unlawful retention of the deposit money could constitute a CSPA violation. While the jury decided that three CSPA violations occurred, the retention of the appellant's deposit was not one of these. Because the retention of the appellant's deposit was not found to be a CSPA violation, the court's judgment awarding $3,630 returned to the appellant could not have been predicated upon a CSPA theory.[7] Without a finding that a CSPA violation occurred concerning the deposit retention, the $3,630 award cannot be considered an award of actual damages that could be properly trebled under R.C. 1345.09(B)(2).
The first assignment of error is overruled.
 III.
The second assignment of error takes issue with the court's award of attorney's fees to the appellant. Under the CSPA, a trial court may award the prevailing plaintiff "a reasonable attorney's fee" if "[t]he supplier has knowingly committed an act or practice that violates [the CSPA]." R.C.1345.09(F)(2). While the trial court awarded fees based on this provision, the appellant contends that amount awarded was too low. We disagree.
In Bittner v. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143, the Ohio Supreme Court addressed the proper standard for assessing an award of attorney's fees to a prevailing plaintiff in a CSPA case. The court held that the proper "starting point" for determining the amount of a fee award is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Id. at 145, citing Hensley v. Eckerhart (1983), 461 U.S. 424,433 [103 S.Ct. 1933, 76 L.Ed.2d 40]. After calculating this starting figure, or "lodestar," the court may then modify the amount upward or downward by application of the various factors listed in DR 2-106(B).[8] Furthermore, when a prevailing plaintiff's claims "can be separated into a claim for which fees are recoverable and a claim for which no fees are recoverable, the trial court must award fees only for the amount of time spent pursuing the claim for which fees may be awarded." Id. Similarly, the court must also separate unsuccessful claims. Parker v. IF Insulation Co., Inc. (Mar. 27, 1998), Hamilton App. No. C-960602, unreported, citing Hensley, 461 U.S. at 434-35, 103 S.Ct. at 1940. Because a trial court's award of attorney's fees under R.C. 1345.09(F) is discretionary, we will not reverse the trial court's decision absent an abuse of discretion. Bittner at 146. A trial court does not abuse its discretion unless it acts unreasonably, arbitrarily, or unconscionably. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. The Bittner court also added a special gloss to the abuse-of-discretion standard, cautioning reviewing courts not to interfere with a fee award unless "the amount of fees determined is so high or so low as to shock the conscience * * *." Bittner at 146, quoting Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc. (1985),23 Ohio App.3d 85, 91.
In this case, the court determined that the appellant's reasonable hourly rate was $100. The court then separated time spent by the appellant's counsel into pre-trial and trial hours. The court found that 65.8233 pre-trial hours were reasonably expended on the appellant's CSPA and conversion claims. In coming to this figure, the court did not consider the time spent by the appellant's attorney in developing a "piercing the corporate veil" theory of liability against the individual shareholder defendants. Based on this figure, the appellant's "lodestar" figure for pre-trial work was $6,582.33. The court then found that the appellant expended thirty-six hours for trial work, which translated into a lodestar rate of $3,600. After making these findings concerning the hours expended, the court reduced the appellant's recovery based on the varying success of the appellant's claims. The trial court determined that the appellant prevailed on only three of the eight asserted claims for CSPA violations and conversion; therefore, it awarded only three-eighths of the pre-trial fees, or $2,468.37. Similarly, the court found that the appellant was entitled to "three-ninths" (or one-third) of the attorney's fees for trial because she prevailed on only three claims while also litigating an unsuccessful attempt to pierce the corporate veil. Accordingly, the court awarded $1,200 in attorney's fees for the trial hours. Adding the pre-trial and trial hours, the court concluded that the appellant was entitled to $3,668.37 in attorney's fees.
We find no abuse of discretion in the trial court's calculation of the attorney fee award. The court's entry makes clear that it calculated the award based on the appellant's counsel's degree of success on the various claims raised during the lawsuit. See Bittner at 145 ("degree of success" is a valid consideration in determining whether to modify the lodestar calculation). The appellant alleged eight violations of the CSPA, sought treble damages, and tried to hold JMMMH's individual shareholders personally liable. The appellant's counsel failed to prevail on most of these claims, providing a reasonable basis for the court to downwardly modify the fee award. See Freeman v. Crown City Mining, Inc.
(1993), 90 Ohio App.3d 546, 556. While we acknowledge that the appellant's counsel achieved some success in recovering seventy-two percent of the appellant's deposit money in addition to $600 statutory damages, we must note that the appellant did not recover the deposit money based on a CSPA theory. Thus, a great deal of the appellant's "success" was not attributable to her counsel's prevailing on a claim for which fees were recoverable. In light of these considerations, we do not see any reason to disturb the trial court's calculation of fees, particularly since the trial court was in the best position to determine the value of the services rendered before it. Bittner at 146, quoting Brooks, 23 Ohio App.3d at 91. Moreover, we do not view the award of $3,668.37 in fees to be so low as to shock this court's conscience. See id. Cf. Cyrus v. Journey (Nov. 30, 1994), Scioto App. No. 94CA2213, unreported (affirming $250 fee award based in part on a finding that plaintiff's attorney did not establish several CSPA violations alleged and did not recover a large amount of the damages requested)
Under this assignment, the appellant also seeks recovery of deposition expenses and a $150 cost deposit paid to the clerk of courts. The appellant argues that the trial court erroneously failed to "render a judgment" regarding whether these expenditures would be recoverable as costs. Significantly, the appellant has failed to specifically assign the failure to tax these costs as an error for our review. We may disregard any purported error that is not separately assigned and argued. App.R. 12(A); State v. Volgares (May 17, 1999), Lawrence App. No. 98CA1, unreported, at fn. 1. The appellant's arguments concerning these costs are therefore not properly before us on this appeal.
The second assignment of error is overruled.
 IV.
In her third assignment of error, the appellant raises an additional argument concerning the trial court's attorney fee award. The appellant argues that the trial court erroneously failed to award any attorney's fees for any post-trial activities.
A prevailing party's attorney's fees in a CSPA case are not absolutely limited to trial and pretrial matters. For example, it has been held that attorney's fees expended on appeal by a consumer defending a judgment in his favor are recoverable under the CSPA. See Tanner v. Tom HarriganChrysler Plymouth, Inc. (1991), 82 Ohio App.3d 764. TheTanner court recognized that a contrary rule would undermine the purpose of the CSPA, which is to allow private redress of individual wrongs while deterring future violations. Id. at 766. The only limitation on fees contained in R.C. 1345.09(F) pertains to "work reasonably performed," which should include any part of the "legal process of achieving and maintaining the judgment for the consumer." Id.
The appellant interprets the trial court's denial of post-trial fees as being based solely on the fact that the fees were expended after trial. The court did not, however, expressly state that it denied post-trial fees simply because they were expended post-trial. Rather, the court stated that it was not awarding fees for post-trial activities because such fees "were not expended in direct pursuit of a consumer sales practices act violation." The record supports the trial court's position. The appellant's counsel presented an exhibit setting forth the time expended on this case, including the time expended post-trial and prior to the attorney fee hearing. The exhibit lists four principal post-trial activities, totaling 6.766 hours, for which the appellant sought attorney's fees. All but one of these activities related to the attorney fee hearing itself; the remaining activity was an unexplained letter written by the appellant's counsel. Thus, it appears that the appellant is seeking fees for post-trial action relating to his litigation of the attorney's fees issue. A trial court does not abuse its discretion in denying fees for time expended in pursuing attorney's fees. See Tanner v. Tom Harrigan ChryslerPlymouth, Inc. (1992), 82 Ohio App.3d 767, 769.[9]
The third assignment of error is overruled.
 V.
We analyze the fourth and fifth assignments of error together, as each deals with the propriety of a directed verdict in favor of the individual appellees. In the fourth assignment, the appellant argues that the trial court erred in directing a verdict in appellee Robbins' favor on the CSPA claims. The appellant alleges in the fifth assignment that the court improperly directed a verdict in favor of appellees John and Rosemarie Molnar, against whom the appellant sought to "pierce the corporate veil."
A motion for a directed verdict under Civ.R. 50(A)(4) tests the legal sufficiency of the evidence and therefore presents a question of law, even though the court must review and consider the evidence when deciding the motion. Howell v.Dayton Power Light Co. (1995), 102 Ohio App.3d 6, 13. Accordingly, we review de novo the trial court's grant of Mr. Robbins' Civ.R. 50(A)(4) motion. Id.; O'Day v. Webb (1972),29 Ohio St.2d 215, paragraph three of the syllabus. A court must deny a motion for directed verdict if substantial competent evidence supports the position of the non-moving party, such that reasonable minds could reach different conclusions based upon the evidence. Apel v. Katz (1998),83 Ohio St.3d 11, 19; Wagner v. Roche Laboratories (1996),77 Ohio St.3d 116, 119. In evaluating a directed verdict motion, the court must construe the evidence most strongly in favor of the non-moving party and consider neither the weight of evidence nor the credibility of witnesses. Ruta v.Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68-69.
 A.
We first address the propriety of a directed verdict in favor of Mr. Robbins, who was the president of JMMMH. An individual's mere status as a corporate officer is generally insufficient to impose individual liability. Courts have held, however, that a corporate officer may be held individually liable for his own acts that violate the CSPA. See, e.g. State ex rel. Fisher v. Warren Star Theater (1992),84 Ohio App.3d 435, 443; see, also, Cent. Benefits Mut. Ins.Co. v. RIS Admrs. Agency, Inc. (1994), 93 Ohio App.3d 397, 403
(corporate officer may be individually liable for torts committed in performance of his duties). By directing a verdict for Mr. Robbins on the CSPA claims, the trial court decided that no reasonable juror could conclude that Mr. Robbins personally committed any CSPA violations. We agree that a directed verdict was proper, but for different reasons.
As we noted in disposing of the first assignment of error, the appellant has mischaracterized this case as one for damages. In refusing to perform under the terms of the purchase agreement and demanding a return of her deposit, the appellant has actually opted for rescission of the contract with JMMMH. When a plaintiff-consumer opts for rescission under the CSPA, he or she is rescinding "the transaction,"i.e. the contract between the consumer and the supplier. See R.C. 1345.09(A) (B). To properly maintain an action to rescind a contract, there must be privity of contract between the plaintiff seeking rescission and the defendant against whom rescission is sought. See Booth v. KK Homes (Mar. 9, 1979), Wood App. No. WD-78-21, unreported, citing Voytovich v.Bangor Punta Operations, Inc. (C.A.6, 1974), 494 F.2d 1208; see, also, Aluminum Line Products Co. v. Rolls-Royce Motors,Inc. (1994), 98 Ohio App.3d 759, 767 (direct buyer-seller relationship must exist for rescission-like remedy of revocation of acceptance to be available under R.C. 1302.66) In this case, the appellant entered into a purchase agreement with JMMMH, which contracted with the appellant under the trade name of Chillicothe Home Center. As the seller, JMMMH was therefore the proper defendant in an action for rescission. Mr. Robbins, however, was not a party to the purchase agreement and therefore cannot be held liable for rescission. See Booth, supra (upholding directed verdict in favor of mobile home manufacturer because it was not a party to purchase agreement). A directed verdict in Mr. Robbins' favor was therefore proper in any event.[10] We express no opinion regarding whether a directed verdict in Mr. Robbins' favor would have been correct had the appellant actually elected a damages remedy.[11] The fourth assignment of error is overruled.
 B.
In the fifth assignment, the appellant challenges the trial court's decision to direct a verdict in favor of appellees John and Rosemarie Molnar, who were shareholders in JMMMH. In addition to pursuing her claims against the corporation, the appellant attempted to "pierce the corporate veil" and hold the Molnars individually liable for the various claims alleged in the complaint. We hold that a directed verdict for the Molnars was correct.
It is a fundamental principle of corporate law that a corporation is a legal entity unto itself, separate and apart from the natural persons composing it. Belvedere CondominiumUnit Owners' Assn. v. R.E. Roark Cos., Inc. (1993), 67 Ohio St.3d 274,287. This concept is a legal fiction designed to facilitate the transaction of business for both the corporation and those who do business with it. Id., citingState ex rel. Atty. Gen. v. Standard Oil Co. (1892), 49 Ohio St. 137, paragraph one of the syllabus. If, however, the corporate form is used to subvert the intent and policy of this legal fiction, it may be disregarded. Dirksing v. Blue Chip Architectural Products, Inc.
(1994), 100 Ohio App.3d 213, 226. "Under this exception, the `veil' of the corporation can be `pierced' and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." Belvedere at 287. Courts will permit this "piercing of the corporate veil" only if the shareholder is indistinguishable from or the "alter ego" of the corporation itself. Id.
In Belvedere, the Ohio Supreme Court promulgated a three-part test for determining whether the corporate veil should be pierced and an individual shareholder held liable. The corporate form may be disregarded when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. Belvedere at paragraph three of the syllabus; see, also, Bucyrus-Erie Co.v. Gen. Products Corp. (C.A.6, 1981), 643 F.2d 413. The burden of proving that the corporate veil should be pierced lies with the party seeking to hold individual shareholders liable. Zimmerman v. Eagle Mtge. Corp. (1996), 110 Ohio App.3d 762,772. The decision whether to pierce the corporate veil after considering these factors is primarily a matter for the trier of fact. See Wiencek v. Atcole Co., Inc. (1996),109 Ohio App.3d 240, 245; Clinical Components, Inc. v. LefflerIndustries, Inc. (Jan. 22, 1997), Wayne App. No. 95CA0085, unreported.
The appellant points to a number of factors supporting her claim that the Molnars should be held personally liable, all of which are linked to the 1992 agreement in which John Molnar sold fifty percent of the corporation' s stock to Mr. Robbins. In that agreement, Mr. Molnar ceded total control of the corporate operation to Mr. Robbins. Since that time, the appellant argues that the corporation has been undercapitalized and has failed to follow corporate formalities (viz, lack of shareholder meetings). The appellant also presented evidence that Rosemarie Molnar collected a $60,000 annual salary without performing any duties as secretary-treasurer, even at times when the corporation was having difficulty meeting existing obligations. As further evidence for piercing the corporate veil, the appellant points to the corporation's lease of property from Mr. Molnar for use by the business. The appellant characterizes the lease between Mr. Molnar and the corporation as "unrealistic," calling for the corporation to pay exorbitant amounts in rent. The appellant also calls attention to the fact that Mr. Molnar terminated the lease in August 1996 at the behest of Mr. Robbins, after the appellant filed suit. The end of the lease in turn brought an end to JMMMH's operation.[12] Based on all of these factors, the appellant argues that the Molnars could have taken part in a scheme to siphon corporate assets, making it more difficult for her to reclaim her deposit.
We acknowledge that the appellant has presented evidence on a number of factors that courts have used to justify a piercing of the corporate veil. For example, courts have pointed to undercapitalization, failure to observe corporate formalities, the absence of adequate corporate records, and unjust or inequitable results as reasons for disregarding the corporate fiction and holding individual shareholders potentially liable. See, e.g., Wiencek, supra,109 Ohio App.3d at 245; Kuempel Serv., Inc. v. Zofko (1996), 109 Ohio App.3d 591,597-98; Link v. Leadworks Corp. (1992), 79 Ohio App.3d 735,744. A common thread in these cases, however, was that the individual shareholder(s) potentially liable had a clear degree of control over the corporate affairs. The first element of the Belvedere test requires a party seeking to pierce the corporate veil to establish "control over the corporation by those to be held liable * * *." Belvedere at paragraph three of the syllabus. To satisfy this element, the appellant had to make at least a prima facie showing "that the individual and the corporation are fundamentally indistinguishable." Id. at 288. The appellant presented no evidence that the corporation was merely the alter ego of the Molnars, let alone that the Molnars exercised any control over the business. The appellant does not dispute that Mr. Robbins, and not the Molnars, controlled the day-to-day operations of the corporation since his purchase of half the corporation's stock in 1992. Without any evidence that the Molnars controlled the corporation, there exists no justification for holding them individually liable.
The fifth assignment of error is overruled.
 VI.
In the sixth assignment of error, the appellant challenges the trial court's jury instructions concerning conversion, expert testimony, and "substantial performance." None of these contentions has merit.
The appellant first argues that the court's instruction on her conversion claim was erroneous. The elements of a conversion cause of action are: (1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. Haul Transportof Va., Inc. v. Morgan (June 2, 1995), Montgomery App. No. 14859, unreported; see, also, Ohio Tel. Equip. Sales, Inc.v. Hadler Realty Co. (1985), 24 Ohio App.3d 91, 93 (defining conversion as "any exercise of dominion or control wrongfully exerted over the personal property of another in denial of or under a claim inconsistent with his rights"). Despite the court's instruction on these elements, the appellant contends that the instruction is incomplete in that it "disregards the trust imposed on deposits * * * and the fact that the consumer may have a right to all of her deposit or only a part of her deposit." The appellant, however, did not object to the instruction on this ground and has therefore waived this argument for purposes of appeal. See Civ.R. 51(A); see, also,Leber v. Smith (1994), 70 Ohio St.3d 548, 552.
The appellant also takes issue with another part of the conversion instruction. In addition to instructing the jury on the elements of conversion, the court gave a further instruction concerning the appellees' affirmative defense to the conversion claim, i.e. that they were allowed to retain the deposit as a reasonable amount of compensation for the appellant's failure to complete the purchase. The appellant argues that this instruction was "prejudicial" because of the reference to Paragraph 6 of the purchase agreement Again, however, the appellant failed to object on this ground during trial as required by Civ.R. 51(A) and therefore waives the issue. Further, the appellant sheds no light on how this instruction was prejudicial.
Another challenged instruction deals with accountant Stephen Dawes' testimony concerning J.M. Mobile Modular Home's financial condition. The appellant argues that the court omitted any reference to Mr. Dawes as an expert witness. This issue was also waived, however, as our review of the record reveals no objection to the court's instruction. The appellant's counsel, in fact, appeared to agree with the court's view that no expert witness instruction was necessary.
Finally, the appellant challenges the court's failure to correctly instruct on the issue of "substantial performance. The appellant objected to the instruction but failed to indicate a specific basis for that objection. Thus, the appellant failed to formally comply with Civ.R. 51(A). SeeR.H. Macy Co. v. Otis Elevator Co. (1990), 51 Ohio St.3d 108,110. Further, we note that the appellant's brief offers no coherent argument indicating what instruction on substantial performance" was needed.
The sixth assignment of error is overruled.
 VII.
In sum, we overrule each of the assignments of error raised by the appellant. Accordingly, we affirm the judgment of the trial court.
 APPENDIX
"Interrogatory No. 1 ¶ Do you find, by a preponderance of the evidence, that the defendants converted (unlawfully retained) plaintiff's $5,050.00 for the corporation's own use? ¶ No.
"Interrogatory No. 2 ¶ Do you find, by a preponderance of the evidence, that the plaintiff Laura Cremeans made a false or misleading material statement in the credit application that she submitted to JM [sic] Mobile and Modular Homes, Inc. (doing business as Chillicothe Home Center) and Greentree Financial Services? ¶ Yes.
"Interrogatory No. 3 ¶ If your answer to Interrogatory Number 2 is Yes, do you find by a preponderance of the evidence that the defendant J.M. Mobile and Modular Homes, Inc., [sic] (doing business as Chillicothe Home Center), reasonably relied upon those false or misleading statements and as a result sustained damage? ¶ Yes.
"Interrogatory No. 4 ¶ If your answer to Interrogatory Number 3 is Yes, do you find by a preponderance of the evidence that the amount of $5,050.00 is reasonable compensation to the defendants for damage sustained by them? ¶ No.
"Interroqatory No. 5 ¶ If your answer to Interrogatory Number 4 is No, what amount of money do you find to be reasonable compensation for damage sustained by the defendants? ¶ $1,420.
"Interrogatory No. 6 ¶ Do you find, by a preponderance of the evidence, that the defendants misrepresented the style of the mobile home which was the subject of this transaction with regard to the color of the kitchen cabinets? ¶ No.
"Interrogatory No. 6A ¶ Do you find, by a preponderance of the evidence, that the defendants misrepresented the style of the mobile home which was the subject of this transaction with regard to the color or pattern of the kitchen floor? ¶ No.
"Interrogatory No. 7 ¶ Do you find, by a preponderance of the evidence, that the defendants misrepresented the style of the mobile home which was the subject of this transaction with regard to the deluxe kitchen package? ¶ No.
"Interrogatory No. 8 ¶ Do you find, by a preponderance of the evidence, that the defendants misrepresented the style of the mobile home which was the subject of this transaction with regard to the glamour bathroom? ¶ Yes.
"Interrogatory No. 9 ¶ Do you find, by a preponderance of the evidence, that the defendants misrepresented the style of the mobile home which was the subject of this transaction by attempting to sell to the plaintiff a mobile home with skylights? ¶ Yes.
"Interrogatory No. 10 ¶ Do you find, by a preponderance of the evidence, that the defendants failed to give or to deliver to the plaintiff a receipt for her deposit in the amount of $50.00? No.
"Interrogatory No. 11 ¶ Do you find, by a preponderance of the evidence, that the defendants failed to give or to deliver to the plaintiff a receipt for her cash partial down payment in the amount of $5,000.00? Yes.
"Interrogatory No. 12 ¶ Do you find, by a preponderance of the evidence, that the control over the corporation, JM [sic] Mobile and Modular Homes, Inc., by William Robbins, was so complete that the corporation had no separate mind, will, or existence of its own? No.
"Interrogatory No. 13 ¶ Do you find, by a preponderance of the evidence, that William Robbins exercised control in such a manner as to commit fraud or an illegal act against the plaintiff who is seeking to disregard the corporate entity? ¶No.
"Interrogatory No. 14 ¶ Do you find, by a preponderance of the evidence, that injury or unjust loss resulted to the plaintiff from such control and wrong? ¶ No.
"Interrogatory No. 15 ¶ Do you find, by a preponderance of the evidence, that the plaintiff brought or maintained an action that is groundless, and that she brought or maintained the action in bad faith? ¶ No."
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellees recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
Kline, P.J.: Concurs in Judgment Only, Evans, J.: Concurs in Judgment and Opinion.
 _________________________ William H. Harsha, Judge
[1] The caption continues to list "William Robbins, dba Chillicothe Home center" as a defendant-appellee. However, the allegations of the appellant's amended complaint, as well as the evidence adduced at trial, indicate that Chillicothe Home Center is a trade name of JMMMH and not of Mr. Robbins.
[2] Paragraph 6 of the purchase agreement stated: "If I [buyer] fail to complete this purchase within thirty (30) days of this contract, or within an agreed-upon extension of time (other than cancellation because of an increase in price), you [seller] may keep that portion of my cash deposit which will reimburse you for expenses and other losses including attorney fees and court costs incurred, because I failed to complete this purchase."
[3] The Chillicothe Home Center eventually found another buyer for the home the appellant was supposed to purchase. The appellant later learned that, in addition to having skylights, the home did not include the "Glamour Bath" package she had ordered.
[4] Civ.R. 49(A) requires the court to submit general verdict forms for the jury to render its verdict. The transcript shows that the court was unsure how it could phrase a general verdict form in light of the perceived complexity of the litigation. We note, however, that a general verdict form is mandatory. Shellhouse v. Norfolk Western Ry. Co.
(1991), 61 Ohio St.3d 520, syllabus. Nevertheless, the parties acquiesced to the court's submission of the case through jury interrogatories and none of the parties raises the court's error as an issue on this appeal. Thus, the court's non-compliance with Civ.R. 49(A) is waived. See Hernerv. Durable Mat Co. (Jan. 28, 1994), Huron App. No. H-93-3, unreported;Harvey v. Clopay Corp. (Mar. 18, 1986), Franklin App. No. 85A8-643, unreported. Despite the parties' waiver of this issue, trial courts are advised that the procedure used in this case should not be the norm.
[5] The interrogatories and the jury's responses are listed in an appendix to this opinion.
[6] We express no opinion as to the trial court's award of $600 in statutory damages for the three CSPA violations found to have been committed by JMMMH. The appellees did not file a cross appeal concerning the propriety of this award.
[7] It is unclear what theory the court utilized in awarding the $3,630 to the appellant. The jury answered "No" to the question of whether there was a conversion of the appellant's deposit, yet concluded that JMMMH was not entitled to keep the full amount. The court awarded the appellant the $3,630 of her deposit the jury felt she was entitled to, yet expressly ruled against the appellant on her conversion claim. Thus, it appears that the court awarded $3,630 to the appellant without a clear indication of what legal theory entitled her to that sum. What is clear, however, is that the CSPA could not have formed the basis for the award since the jury was never instructed that the retention of the deposit money could he a CSPA violation.
[8] These factors are: the time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent. Bittner, 58 Ohio St.3d at 145.
[9] The appellant's brief mentions that she "ought to recover her costs in attorney fees on appellate work." To the extent this sentence reflects an attempt to secure fees for pursuing this appeal, we decline to address it as not being properly before us.
[10] This does not mean, of course, that Mr. Robbins could not have been held liable under a "piercing the corporate veil" theory. When a plaintiff seeks to pierce the corporate veil, he essentially seeks to establish that the defendant shareholder is merely the "alter-ego" of the corporation. Thus, an attempt to hold Mr. Robbins liable for rescission under this theory would be tantamount to rescinding the purchase agreement with J.M. Mobile Modular Homes, i.e. his alter ego. The court denied Mr. Robbins a directed verdict on this theory and the jury ultimately found that piercing the corporate veil was not warranted as to Mr. Robbins.
[11] But, cf., Haynes v. George Ballas Buick-GMC Truck (Dec. 21, 1990), Lucas App. No. L-89-163, unreported ("While we do not address the question of whether * * * a consumer may rescind a contract against a party who is not in privity of contract with the consumer, there is nothing under [the CSPA] which provides that privity of contract is a necessary prerequisite to recovery of damages.").
[12] The appellant describes JMMMH as a "defunct" corporation at the time of trial. This is a mischaracterization. The appellant presented no evidence that JMMMH ceased to exist as a corporate entity. Indeed, there was no evidence that the corporation wound up its affairs. Rather, JMMMH remained a corporate entity at the time of trial, albeit one that was not doing business as a seller of mobile and modular homes.